## BUSELL TRIMMER COMPANY *v.* STEVENS.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF MASSACHUSETTS.

No. 71. Argued November 12, 13, 1890. — Decided December 15, 1890.

Letters patent No. 238,303, granted to William Orcutt, March 1, 1881, for improvements in rotary cutters for trimming the edges of boot and shoe soles, although the patented claim shows great industry on the part of the patentee in acquiring a thorough knowledge of what others had done in the attempt to trim shoe soles in a rapid and improved mode, by the various devices perfected by patents for that purpose, good judgment in selecting and combining the best of them, with no little mechanical skill in their application, are nevertheless invalid for want of patentable invention, as the claim presents no discoverable trace of the exercise of original thought, and is only an improvement in degree upon previous cutters, and therefore not patentable.

There is no substantial difference between the improved cutter for cutting the teeth of geer wheels, etc., patented to Joseph R. Brown by letters patent

No. 45,294, dated November 29, 1864, and the patent in controversy in this suit, except in the configuration of their molded surfaces, and this is not a patentable difference, even though the Brown cutter was used in the metal art and the Orcutt cutter in the leather art.

*Burt* v. *Evory*, 133 U. S. 349, and *Florsheim* v. *Schilling*, 137 U. S. 64, affirmed and applied to this case.

In EQUITY for the infringement of letters patent. Decree dismissing the bill. Complainants appealed. The case is stated in the opinion.

*Mr. J. E. Maynadier* for appellants.

*Mr. T. W. Porter* for appellees.

Mr. JUSTICE LAMAR delivered the opinion of the court.

This was a suit in equity, brought by the Busell Trimmer Company, a New Hampshire corporation, and William D. Orcutt against Frank M. Stevens, Henry B. Cunningham and Samuel N. Corthell, for the alleged infringement of letters patent No. 238,303, issued to Orcutt, March 1, 1881, upon an application filed January 6, 1879, for "improvements in rotary cutters, for trimming the edges of boot and shoe soles."

The bill, filed May 9, 1884, alleged the issue of said letters patent to Orcutt, and the granting of an exclusive license to the Busell Trimmer Company to manufacture and sell the invention described therein, and set out, with considerable detail, the value, importance and novelty of the patented invention.

It then alleged that, as the result of a suit in equity brought in the court below in January, 1882, by these complainants against the Corthell Manufacturing Company, for infringements of the aforesaid letters patent, such proceedings were had that a consent decree was entered in complainants' favor, the following resolution of the stockholders of the defendant in that suit having been passed as a part of such compromise:

"*Resolved*, That in the acceptance of the offer this day tendered to us by the Busell Trimmer Company it is done with the express understanding by all the parties thereto that

it is mutually entered into for the purpose of consolidating the several interests of the two companies, and to that end none of the parties in their corporate capacity or as individuals will directly or indirectly enter into the manufacture of trimming machines or cutters for the sole edge of boots and shoes, except in connection with and for the benefit of the two companies as consolidated."

It further alleged that the defendants were, at that time, stockholders in the Corthell Manufacturing Company, and acquiesced in such resolution; that they were afterwards employed by the complainant, the Busell Trimmer Company, in various capacities, until within about a year previous to the commencement of this suit; that, while so employed, the defendants Stevens and Cunningham secretly sold small cutters manufactured with complainants' tools, which were facsimiles of those manufactured by complainants; and that, after they left complainants' employ, the defendants associated themselves together to manufacture, and continued to manufacture and sell, cutters embracing complainants' invention, in violation of complainants' rights under the patent, and to their damage $20,000.

The bill prayed for an injunction, an accounting and damages, and for other and further relief.

The answer made no reference to the consent decree and compromise between the Busell Trimmer Company and the Corthell Manufacturing Company, referred to in the bill, but set up, as defences, (1) The invalidity of the patent, because the thing alleged to have been patented had been in long use previous to that time, and was not useful; (2) The insufficiency of the specification and drawings of the patent to enable one skilled in the art to which it pertained to construct the article for which the patent was claimed; (3) The want of novelty in the alleged invention; (4) The long continued use of rotary cutters embodying the same principles as were contained in the alleged invention, by various persons and firms engaged in the manufacture of boots and shoes, in various parts of the United States; and (5) That Orcutt's prior patent No. 212,971, dated March 4, 1879, showed and described all that was

claimed in the patent in suit, and that from the date of that patent to January, 1881, Orcutt made no claim to the subject matter of the later patent, thus abandoning such invention to the public, by reason whereof the patent in suit was void.

Replication was filed, issue was joined, proofs were taken, and on the 14th of September, 1886, a final decree was entered by the Circuit Court, held by Mr. Justice Gray and Judge Colt, dismissing the bill; from which decree complainants appealed to this court. The opinion of the Circuit Court, delivered by Judge Colt, is found in 28 Fed. Rep. 575.

The specification, claims and drawings of the patent in suit are as follows :

" My invention relates to that class of rotary cutters, consisting of a series of cutting blades arranged about a common hub, and it consists in certain peculiarities of construction of the blades, more fully described below.

" Figure 1 is a perspective view of one form of rotary cutter embodying my invention. Figures 2 and 3 are perspective views (enlarged for greater clearness) of the upper portion of one of the blades. Figure 4 is a cross-section enlarged, illustrating my improved cutter as used.

" The blades $d$ of my improved cutter have a flat front face, $a$, a flat rear face, $b$, and a top surface, $c$. A number of ridges, 1, 2, extend across this top surface or circumferentially of the cutter, making what is called a 'molded' or 'fancy' surface, which is the converse of the sole edge desired, every ridge, 2, 2, making a corresponding depression in the sole edge, the ridge 1 at the side of the cutter, and when in use next the rand guide takes out the rand or welt.

" The main feature of my invention consists in the blade thus formed, with a flat front face and a molded or fancy top surface the converse of the sole edge, and having the ridge 1 or the ridges 2, 2, either or both, extending across its top surface — that is, extending from front to back, as shown in the drawings — my improved cutter having a series of such blades, the cutting edges of each blade extending to one side of the cutter to adapt it for use on the edge of the sole next the upper, and each cutting edge having the same relation with the axis

as all the others.. Each blade $d$ is shown in this instance as a distinct piece secured to a hub, $d'$, substantially as in the United States patent No. 82,402 to Harrington, dated September 22, 1868. My invention, however, does not relate to the mode or process of manufacture, but to the article of manufacture, and the blades and hub may be in one piece and constructed by any suitable mode or process too well known to need description, and I disclaim as any part of my invention both the cutters and both the modes of manufacture described in the patent to Harrington above named and in the patent to Brown, No. 45,294, dated November 29, 1864.

"The flat front faces $a$ of the blades are not radial, but are so inclined as to make each blade slightly hooking, and thereby form a knife edge at the intersection of the flat front face with the top surface $c$ and its ridges, 1, 2, 2. This is very desirable, for if the front faces $a$ be not so inclined the tool will be a scraper rather than a rotary cutter.

"The blades are made quite thick from front to rear, so that they may be ground back as they become dull, and they are ground only on their front faces $a$, these faces being always maintained at substantially the same pitch. The grinding is done with a flat grinding surface, (the flat side of a small emery wheel,) and does not alter at all the shape of the cutting edge of the blades. The tops $c$ and ridges 1, 2, 2 are inclined rearward, to give the necessary clearance, as will be well understood.

"I am aware of the patent No. 207,395 to Corthell, but in that cutter each blade is flat on top, and its front face is molded, the cutting edge being formed by the intersection of the flat top and molded front face, and the ridge corresponding to the ridge 1 of my cutter is across the front face of the blade, or nearly radial, instead of across the top $c$ of the blade, or nearly circumferential, as in my cutter. The same is true of the ridges corresponding to the ridges 2 of my cutter. When the ridge 1 is at one side of the front face, as in Corthell's cutter, the height of the projection above its base is limited by the necessary closeness together of the blades. Moreover, the depth of cut is always less than the height of the projec-

tion. The main object of my invention is to provide a sole-edge cutter, in which the depth of cut is the same as the height of the projection, and in which the height of the projection is not limited by the closeness together of the blades. I am also aware of the patents to Brown and Harrington, above mentioned, but both those cutters are wholly unsuited for trimming

Fig.1.

Fig. 2.

Fig. 3.

Fig. 4.

sole edges, and both lack the ridge 1 at one side of the top surface of the blade for taking out the rand, and also lack the ridges 2, 2 for beading the sole edge. I disclaim, therefore, all that is shown in either of the above-named patents.

"What I claim as my invention is:

"1. A rotary cutter for trimming sole edges, the blades $d$ of which are provided with flat front faces $a$, and have their outer or peripheral ends $c$ molded throughout to a uniform shape, the converse of the desired shape to be given to the sole

edge, and slightly eccentric to the axis of the cutter, substantially as described.

" 2. A rotary cutter for trimming sole edges, the blades *d* of which are each provided with a flat front face, *a*, and a slightly eccentric cutter or peripheral end, *c*, having formed thereon the end ridges 1 and 2, extending circumferentially across said face, substantially as and for the purposes described."

, The Circuit Court held that the patentability of the invention was to be determined by reference to two classes of prior tools, namely, the old hand tool or plane, and the Brown gear cutter, patented in 1864, and found upon a comparison between the various forms of the Brown gear cutter and the Orcutt cutter, that there was no substantial difference between them, except as to the shape of the top surface of the blades that were used to cut the form or outline of the path or figure in the material operated upon; that the form of the cutting teeth in the Orcutt patent was substantially the same as that used in the old hand plane or tool; that the use of the rotary rand knife in the Orcutt patent, in connection with the rand guide, claimed by him to perform a different function from the rand lip of the old hand plane, was not sufficient to sustain the patent, because both the rotary rand knife and the rand guide were found in prior devices ; and that the substance of Orcutt's improvements lay in the application of the well-known form of blade to a Brown milling cutter, for the purpose of trimming the edges of boot and shoe soles, which was merely a case of double use, and was, therefore, not patentable.

The errors assigned are, that the court erred (1) In holding that the application of a well-known form of blade, used in the old hand tool for trimming sole edges, to a metal milling cutter, also old and well known, for the purpose of producing a rotary cutter for trimming sole edges, is a case of double use, and not patentable; (2) In holding that, in view of the state of the art, there was no invention in the Orcutt cutter; and (3) In holding that, in view of the two classes of prior tools referred to, taken in connection with a third class of old devices, in which both the rotary rand knife and the rotary rand guide were found, the patent could not be sustained.

It is hardly necessary to discuss these assignments of error *seriatim.* It will be sufficient, perhaps, to refer to some of the essential features of the patent in suit which are claimed to constitute elements of invention.

We have examined the evidence in the case very carefully. That of appellants' principal expert witnesses, John A. Coleman, Frederick W. Coy and O. L. Noble, was unusually clear and intelligent, and was given very ingeniously in support of the theory of the appellants' case; but we think that even their testimony, when subjected to the analysis of cross-examination, contains retractions and admissions fatal to the validity of Orcutt's patent, as containing a patentable novelty.

We are clearly of opinion that the Circuit Court was correct in its construction of this patent. In this connection, the state of the art when the application for the patent was made must be taken into consideration. The old hand plane or tool for trimming the edges of boot and shoe soles had been in existence for a long time; but, while it accomplished the purposes for which it was designed, it was found to operate too slowly to meet the demands of the business. Accordingly, various attempts had been made to perform the work done by the old hand tool, with rotary cutters operated by machinery. A number of patents were issued to various persons, named in the record, for various forms of such devices, long before the date of Orcutt's application. We were furnished on the argument with specifications and drawings of many of such patents, — some English, but mostly American, — running back as early as 1855, when an English patent was issued to one Molière, for what was known as a burr cutter, used to cut only the bed or main body of the boot or shoe sole. It is not deemed necessary to refer to all of the various patents issued from that time up to the date of Orcutt's patent. All of them may be said to have had but one object, viz., the performance of the work formerly done only by the old hand tool; and were improvements, more or less new and useful, in the leather art. An examination of them discloses the fact that, to a greater or less degree, each was an improvement on its predecessors, and was, in like manner, improved upon by those that

followed, in the order of time. The operations of those rotary cutters did not entirely supersede the use of the old hand tool, or the embodiment of the principles of that tool in an automatic machine which imitated the movements of that plane or tool when at work. A number of patents, it appears, were issued for such machines.

The precise features, or combination of features, which, it is claimed, constituted Orcutt's alleged invention, are thus stated by appellants' counsel: " There is nothing whatever in the state of the art of trimming or of burnishing sole edges tending to show any rotary cutter, prior to Orcutt's, made up of a number of blades, each having a rand lip and bed (or a bed, or bed guard, or channel guard in connection with a rand lip and bed), each with a flat front face; and each blade the guard for the cutting edge of the succeeding blade."

We do not think that this statement is sustained by the testimony of the appellants' own witnesses, even putting out of view all the evidence controverting it, given by defendants' numerous expert witnesses, consisting of manufacturers, dealers in shoes, experienced and skilful operators and machinists in making shoes, trimmings, soles and all branches of the leather art. A rotary cutter in the metal art, called the Brown & Sharpe metal cutter, had been well known and in general and constant use seventeen years before the date of the Orcutt patent. The counsel for appellants admits that that rotary cutter " bears a close resemblance to Orcutt's sole-edge cutter. . . . It is made up of a number of blades, each having a flat front face, and a molded top surface, the converse of the surface to be milled ; and moreover, each tooth has the proper clearance, so that, if one of the Brown & Sharpe metal cutters and one of the Orcutt cutters be compared, when not in use, say, one held in the left hand, the other in the right, there is a marked likeness between them ; in fact, no substantial difference, except that one lacks and the other has a rand lip, bed," etc. Similar admissions by Orcutt himself, and by Noble, the manager of his (Orcutt's) company, leave no doubt upon our minds that the principles of construction and operation of the Brown cutter are substantially identical with those of

most, if not all, of the rotary leather cutters. The appellants' counsel, as we have seen, says that the only exception to the marked likeness between the Brown cutter and that of Orcutt is, that "one lacks and the other has a rand lip, bed," etc. With regard to this exception, so asserted, Coleman, the expert witness on whom the appellants mainly rely, testifies as follows: "Q. You have spoken of Orcutt's cutter being adapted to trim at the same time the rand, the bed and the guard of a shoe sole, or, as you term them, the three fundamental principles of the shoe sole. Do you or not regard Orcutt as the first to accomplish that result with a rotary cutter?" His first answer being considered evasive the question was repeated, and he replied, "No, I do not. Others had made different cutters intended to accomplish the same purpose." It is true that with this admission he also connected the somewhat inconsistent declaration that Orcutt, by his alleged invention, "created a structure which differed in form and principle from any tool previously used for the operations of trimming the rand, bed and guard, because he produced a tool which had blades having top-molded faces the converse of the form of the sole edge to be trimmed, and the flat front faces of the teeth were so inclined forward that they could make a proper cutting edge for leather, and those faces could be ground without disturbing the top-molded face of the teeth." But when cross-examined in detail as to each of those alleged novel differences, he admitted that the facility for sharpening Orcutt's cutter without disturbing its periphery (or the top-molded face of the teeth) was the same as in the Brown cutter and the Snell & Atherton hand-trimming tools; that the forward incline (the rake or overhang) of the teeth was the same as in the Snell & Atherton cutters; that, in his opinion, the increase in the number of teeth in the Orcutt cutter over that of Brown, in view of the art as shown by other and earlier cutters, did not constitute, in itself, an element of invention; that rand guides were in common use with a rotary cutter before Orcutt's cutter; that a rand guide as employed in an Orcutt cutter does not perform any other or different office, or effect any other or different result from that which it performed when used

with other rotary cutters earlier than Orcutt's; that the employment of such rand guide in the Orcutt cutter would not in itself constitute an invention; that rand cutters were in common use both with hand tools and rotary sole-trimming tools before Orcutt's patent; that the result or product of the Orcutt cutter, to wit, the sole edge trimmed by it, was identical with that trimmed by the exhibit hand tools; that the shoe was held in the same manner while being trimmed by the Orcutt cutter, as with any other and earlier cutter; and that before Orcutt's invention it was common to trim the rand, the bed and the guard at one and the same operation, with both hand and rotary cutters.

Effort was made to show by other witnesses that the features in the Orcutt patent, specified in the statement of counsel above quoted, are all patentable novelties, especially the combination of them into one device. We repeat, that in view of the previous state of the art we think otherwise. The evidence, taken as a whole, shows that all of those claimed elements are to be found in various prior patents — some in one patent, and some in another, but all performing like functions in well-known inventions having the same object as the Orcutt patent, and that there is no substantial difference between the Brown metal cutter and Orcutt's cutter, except in the configuration of their molded surfaces. That difference, to our minds, is not a patentable difference, even though the one cutter was used in the metal art, and the other in the leather art. A combination of old elements, such as are found in the patented device in suit, does not constitute a patentable invention. *Florsheim* v. *Schilling, ante,* 64, decided at this term of the court, and cases there cited.

We do not think that the cases cited by counsel for the appellants sustain his position that Orcutt's alleged invention is a combination of previous devices, rearranged with connections and adaptations so adjusted as to produce a novel and valuable use. In *LeRoy* v. *Tatham,* 14 How. 156, 177, one of those cases, the claim was for a combination of old parts of machinery to make lead pipes, in a particular manner, under heat and pressure. The combination was held not to be

patentable, the court saying: "The patentees claimed the combination of the machinery as their invention in part, and no such claim can be sustained without establishing its novelty — not as to the parts of which it is composed, but as to the combination." The court also quoted, with approval, the following from *Bean* v. *Smallwood*, 2 Story, 408, an opinion by Mr. Justice Story : "He (the patentee) says that the same apparatus, stated in this last claim, has been long in use, and applied, if not to chairs, at least in other machines, to purposes of a similar nature. If this be so, then the invention is not new, but at most is an old invention or apparatus or machinery applied to a new purpose. Now, I take it to be clear, that a machine or apparatus or other mechanical contrivance, in order to give the party a claim to a patent therefor, must in itself be substantially new. If it is old and well known, and applied only to a new purpose, that does not make it patentable." That case, instead of militating against our view in this, in reality supports it.

The distinction between a double use, as the result of mere mechanical skill, and a new use created by the inventive faculty, is strikingly illustrated in the other case cited by appellants, viz., *Colgate* v. *Western Union Telegraph Co.*, 15 Blatchford, 365. That case was a suit for an infringement of a patent, for the combination of gutta-percha and metallic wire in such form as to encase a wire or other conductors of electricity within the non-conducting substance, gutta-percha, making a submarine telegraph cable which might be suspended on poles in the air, submerged in water or buried in the earth. It was contended that the patent was invalid, because a metallic wire covered with gutta-percha, as a mechanical protection from abrasion or injury from without, existed before the plaintiff's invention. It was decided that the use by the patentee of the wire so covered, to conduct electricity, was not a double use of the covered wire nor a use for a purpose at all analogous to any before made of it; but that it was an entirely new use, the result of a discovery that gutta-percha was an electrical non-conductor, evolved by original thought, totally different from its quality previously known and applied, as a mere mechanical protector from external injuries.

But the patent before us is no such case. The most that can be said of it is that it shows, on the part of Orcutt, great industry in acquiring a thorough knowledge of what others had done in the attempt to trim shoe soles in a rapid and improved mode, by the various devices perfected by patents for that purpose, good judgment in selecting and combining the best of them, with no little mechanical skill in their application; but it presents no discoverable trace of the exercise of original thought.

Furthermore, according to the evidence submitted by the appellants, it is shown that the features of the patent in suit are substantially the same as those in Orcutt's earlier patent of March 4, 1879, having the same object, except that in the patent in suit the teeth are claimed to be detachable from the hub, while in that of 1879 they are shown to be solidly incorporated with the hub. Even admitting such a difference to exist, it does not constitute a patentable difference, in view of the prior state of the art; for the detachable teeth are found in the Corthell patent No. 207,395, of August 27, 1878. But, as a matter of fact, there is no such difference; for, as stated in the specification of the patent in suit, " the blades and hub may be in one piece," etc., thus showing that no claim is made in the patent itself on that score. This, of itself, would be sufficient to defeat the later patent.

It may be admitted that Orcutt's later patent performed the work it was designed to accomplish in a better and more workmanlike manner than any of the preceding cutters patented, because, as already stated, there were constant improvements in the art to which it related. So far as this record shows, it was the last of a series of patents designed to accomplish the same object. As such, it necessarily retained all the beneficial features of those earlier patents, and, to a certain extent, improved upon them. Such improvement, however, was an improvement in degree only, and was, therefore, not patentable. *Burt* v. *Evory*, 133 U. S. 349, and cases there cited.

*Decree affirmed.*