LAMSON CONSOL. STORE SERVICE CO. v. HILLMAN et al.

SAME v. AIR LINE CARRIER CO. et al.

(Circuit Court of Appeals, Seventh Circuit. April 14, 1903.)

Nos. 929, 936.

1. PATENTS—INFRINGEMENT—STORE-SERVICE APPARATUS.

The McCarty patent No. 465,967, for a store-service apparatus for carrying cash and packages, consisting of a combination of (1) an elevated way extending from the cashier's station to a single salesman's station, (2) a car mounted to travel on the way, (3) a receptacle detachably suspended from the car, (4) a catch device for locking the receptacle to the frame of the car, and (5) a separate elevator of which neither the way, car, nor receptacle forms a part, situated stationarily at the end of the way in a position to receive the receptacle, and constructed to raise and lower it to and from the car, shows a combination of elements some of which had been used in prior devices, but so adapted to cooperate as to disclose patentable invention, and which stands at the head of a class, although in a well-developed art, and is entitled to a liberal range of equivalency. So construed, claim 1 is infringed by the apparatus of the Gipe patents, Nos. 623,899 and 645,505.

Appeals from the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

The first suit was begun against the proprietors of a store in which was being used a cash and package carrier that was alleged to infringe letters patent No. 465,967, December 29, 1891, to appellant, assignee of the applicant, McCarty; the second, against the builders of the apparatus. By order of court the causes were tried together. From decrees dismissing the bills for want of equity, these appeals are taken.

J. S. Rusk and C. C. Linthicum, for appellant.

R. H. Parkinson and David H. Fletcher, for appellees.

Before JENKINS, GROSSCUP, and BAKER, Circuit Judges.

BAKER, Circuit Judge. The decision turns upon the validity of claim 1, the range of equivalency ascribable to that claim, if valid, and the interpretation of the appellees' device.

Claim 1, and so much of the specification (omitting reference figures) as relates thereto particularly, are as follows:

"My invention relates to apparatus for carrying parcels and packages of merchandise requiring a receptacle on the car larger than that which is used for carrying money merely; and it consists in devices * * * for elevating and lowering a detachable basket or parcel receptacle, and for attaching the basket to the body of the car, and for controlling the upward movement of the basket when elevating, so that it will accurately and automatically attach itself to the body of the car. My improvement is designed to be used in connection with a propelling device consisting of a spring motor mounted near the end of the track, although it is obvious that any other means of propelling or imparting a propulsive movement to the car may be employed. * * * The body of the car hangs from wheels adapted to travel on a wireway, and at its middle part has on either side an arm extending horizontally outward. To the extremity of each of these arms is attached a bell-mouth tube. To the lower part of each of these tubes is hinged a catch device, which extends through a slot into the tube and has a curved handle extending upward and backward. A spring, connecting the tubular piece with the handle of the catch, holds the catch in place within the tube, but allows it to be withdrawn from within the tube when the handle is pressed downward. * * * My basket or parcel receptacle has a serrated arm or projection rising from each side, adapted to enter the bell-mouth tubes and to have their serrations catch upon and hang from the catches. The two arms entering into the two tubes are caught by the two catches, and hold the basket firmly up against the body of the car, in condition for transportation from the salesman's station to the cashier's station. Near the end of the wire I attach, at a point directly over the middle of the car when it is at rest, a framework consisting of the cross-pieces having perforations through their outer extremities. Rods pass through said perforations in the said cross-pieces, and are joined at the top and suspended from the ceiling by a cord passing over a sheave, under a pulley, and thence to an eye in the ceiling, where it is fastened. A cord having a handle extends from said pulley to within reach of the operator, and upon said cord is placed a counterweight. The rods pass below the body of the car, and support at their lower extremity a table about the size of the basket. Said rods and the table form the elevator for the basket. Upwardly extending pins, affixed to the upper surface of this table, serve as guides to locate the proper position of the basket upon it, and the rods are guided by the cross-pieces so that when the whole is elevated the toothed arms will enter the bell-mouth tubes. Around the side pieces of the elevator frame are coiled springs, which press against the lower part of the cross-piece when the table with the basket on it is drawn upward, and the basket brought into connection with the body of the car. These springs, then, are compressed between the table and the cross-piece, and expand when the elevating force is taken away after contact between the car and the basket has been made, and throw the table downward, so that the pins will be wholly below the bottom of the basket, and the car with the basket attached can readily move along the track. The counterweight attached to the cord balances the elevator, so that it will stay in any position in which the operator may leave it, and when, after contact is made between the basket and the car, the table is thrown downward by the expansion of the spring until the tension on the spring is relieved, the table and frame will remain in position just below the basket, ready to receive the basket when it is dropped from the body of the car by the withdrawal of the catches from the serrations in the arms, and the weight of the basket resting upon the table causes the table to drop to its lowermost position. At the end of the way I provide suitable means for causing the release of the basket as the carrier is received from the opposite end of the way. * * * In the operation of my apparatus a bundle or package is

placed in the basket and the basket placed on the table, and the elevator and basket are then raised by pulling downward upon the cord until the basket is connected with the body of the car by the toothed arms engaging with catches. The elevator then drops from the car, as before described, and the car is then propelled by * * * the motor * * * forward along the track.

"While I have shown and set forth a single form of apparatus embodying my invention, it is obvious that many changes and modifications may be made therein without departing from its essential features, which consist in a car and a receptacle detachably locked together, and a separate elevator situated stationarily at the end of the way, and adapted to receive the receptacle from the car and raise and lower it to and from the car.

"What I claim is:

"(1) In a store-service apparatus, the combination of an elevated way, a car mounted to travel on said way, a receptacle detachably suspended from said car, a catch device for locking the receptacle to the frame of the car in its suspended position, and a separate elevator situated stationarily at the end of the way in position to receive the receptacle, and constructed to raise or lower the same to and from the car, substantially as described."

From the last paragraph of the specification, and from the use of general terms in the claim, it seems clear that McCarty believed that he was not improving one or more elements in an existing combination, but had invented a new one; that he was the first to conceive the combination of (1) an elevated way (from the cashier's and checker's station to and ending at a salesman's station, a way incapable of connecting directly the cashier's station with all or several or more than one of the salesmen's stations in the store), (2) a car mounted to travel on the way, (3) a receptacle detachably suspended from the car, (4) a catch device for locking the receptacle to the frame of the car in the receptacle's suspended position (a catch device of which necessarily one part is on the car and the other on the receptacle, so that the receptacle is locked to the car by being brought against it in the right position), and (5) a separate elevator (of which neither track nor car nor receptacle forms a part) situated stationarily at the end of the way in position to receive the receptacle (an elevator distinguished from elevating appliances that are attached to and travel with the car or car and receptacle, and in such controlled position relative to that of the car when at rest that it may receive the receptacle when the receptacle is to be raised and attached to the car, and also when the receptacle is to be detached and lowered from the car), and constructed to raise or lower the receptacle to and from the car; and that, having disclosed this concept and one particular form of apparatus for carrying it into effect, he was entitled to protection from others using the combination "substantially as described," not merely the particular form of elements "substantially as described."

In order to make the apparatus operative to complete the circuit of the receptacle from the salesman's counter to the cashier's station and back to the counter, it is probably necessary to imply, in addition to the elements definitely named in claim 1, means for propelling the car, and means for releasing the catch that locks the receptacle to the car. With respect to the first, the specification shows a spring motor, but adds, "It is obvious that any other means of propelling the car may be employed." Regarding the second,

McCarty, by claim 2, covered the combination of the elements named in claim 1, and the additional element of "means at the end of the way for engaging with and operating said catch device to automatically detach said receptacle from the car." The specification shows a stop against which the upper face of the handle of the catch strikes as the car reaches the end of the way, thereby releasing the catch and detaching the receptacle from the car automatically, that is, by the momentum of the car; but claim 2 covers not merely the particular stop substantially as described, but any means whereby the motion of the car is utilized to release the catch. And since claim 2 embodies a certain kind of unlocking means, namely, automatic, and since separate claims are not to be construed as identical, unless fairly unavoidable (United Nickel Co. v. California Electrical Works [C. C.] 25 Fed. 475; Cohansey Glass Co. v. Wharton [C. C.] 28 Fed. 189; Tondeur v. Stewart, Id. 561; Smead v. Union Free School District [C. C.] 44 Fed. 614; Nat. Cash Reg. Co. v. Am. Cash Reg. Co., 53 Fed. 367, 3 C. C. A. 559; Felix v. Ledos [C. C.] 54 Fed. 163; Robinson on Patents, § 504), the means for releasing the catch, to be implied in claim 1, is any suitable means that performs the same function in the combination, whether automatic or not. For instance, if it was conceded that the McCarty apparatus was useful, novel, and characterized broadly by invention, and that claims 1 and 2 were properly drawn to cover separate subject-matters, then, if appellees were using a device built throughout in exact conformity to McCarty's specification, claim 2 would undoubtedly be infringed; and if, in place of the particular form of stop shown in the specification, appellees substituted another form that served the same purpose of releasing the catch automatically, infringement of claim 2 would not be avoided; and, finally, if appellees tied a cord to the handle of the catch so that the salesman could pull down the handle and release the catch, instead of having the handle depressed by some form of stop, claim 1 would be infringed. Otherwise claim 1 would be rendered utterly nugatory, though the hypothesis is that McCarty's inventive brain was the first to grasp the possibilities of combining the elements thereof in that way.

Is there anything in the prior art to nullify claim 1, or narrow its boundaries to less than McCarty evidently sought to stake out as his own?

Regarding Stancliff, No. 138,950, May 13, 1873; Bacci, No. 260,924, July 11, 1882; Walter, No. 161,079, March 23, 1875; Foster & Colley, No. 297,249, April 22, 1884; and Babb & Keisling, No. 250,624, December 6, 1881—without going into other differences, we note that the hoisting devices are attached to and travel with the car. This method is quite the opposite of having "a separate elevator situated stationarily at the end of the way"; and, while it might not be inconvenient in hay-slings and ship-loading devices, in store-service apparatus its inferiorities to McCarty's way are self-evident.

In Holbrook, No. 282,321, July 31, 1883, and Rice No. 320,965, June 30, 1885, the systems are characterized by having hollow balls moved by gravity along parallel bars. They have no separate car, no detachable receptacle, no separate elevator co-operating with a locking device one part of which is on the car and the other on the re-

ceptacle. We regard the system of cars and detachable receptacles propelled on taut wires as of a class different from that of the rolling hollow balls.

In Fisher, No. 308,481, November 25, 1884; Fisher, No. 314,814, March 31, 1885; Burns, No. 309,520, December 23, 1884; Hinton, No. 321,360, June 30, 1885; and Bostedo, No. 330,553, November 17, 1885—the car and receptacle are let down together by lowering a section of the track, or are removed from the track. They have no detachable receptacle nor separate elevator co-operating with a locking device. The advantages of a system having a permanent track with a car permanently thereon and at hand, ready to be dispatched whenever the receptacle is raised and locked thereto, are obvious.

In Bigelow, No. 330,869, November 24, 1885, the receptacle is raised and hooked to the car by hand. The elevator and locking device are wanting—elements indispensable to the McCarty system, in which a large receptacle suspended from the car is carried at a desirable height above the heads of clerks and customers.

Prior McCarty patents, Nos. 325,425, 325,426, and 325,618, September 1, 1885, show a track and car within reach of the salesman's hand, and a small cup-shaped receptacle attachable to the car by manual turning. No elevator, no locking device of the class necessary to co-operate with an elevator.

Hart, No. 362,443, and Hart & Yoe, No. 362,444, May 3, 1887, are later inventions than McCarty's. This was proven to the satisfaction of the Patent Office, and the evidence in this record establishes beyond doubt that these men were employed by the assignee of McCarty's application, and had full knowledge of McCarty's invention in advance of making the improvements set forth in the abovementioned patents.

The specification of Kenney, No. 343,539, June 8, 1886, differentiates his system entirely from that of McCarty:

"The invention is embodied in an apparatus of that class in which a continuously moving conveying device or car passes all or a considerable number of stations in the store on its way to and from the cashier's desk, the said conveying device or car collecting the cash receptacles that are to be taken to the cashier's desk as it passes the different stations, and at the same time discharging the receptacles that are returning from the cashier's desk at the proper station."

The distinguishing features of the Kenney structure, stated generally, are a circuitous track leading past the cashier's desk and all the salesmen's stations; a car propelled by electric motor (or other constant means), and moving continuously round the circuit in one direction; on each side of the car an arm supporting a horizontal bar parallel to the track; at each salesman's station a horizontal bar parallel to the track, over which cash receptacles may be hooked, and means for raising it to the level and at one side of the car; a stop at the rear end of the car bar, elevated automatically, as the car passes each salesman's station, to strike the hooks of the cash receptacles and sweep them from the salesman's bar to the car bar, and immediately thereafter depressed to permit the cash receptacles to be swept from the car bar by a permanent stop at the cashier's desk into a suit-

able receptacle; a ball rigidly depending from each cash receptacle, the balls being of a different size for each salesman's station; at each salesman's station a gate, on the side of the track opposite to the elevating bar, through which the balls of the cash receptacles of all other stations may pass, and which catches the balls sent from that station and now being returned from the cashier's desk, whereupon the stems between the balls and the receptacles are engaged between parallel guides down which the receptacles slip to the station. McCarty contemplated a system in which there should be as many separate tracks as there were salesmen's stations to be served, each salesman having a direct and independent connection with the cashier. If the Kenney track should be split up to give separate service to each salesman, nevertheless there would be no "end of the way," for Kenney says that in such a case it would be necessary to build a loop at each end, round which the car could proceed in its continuous movement in one direction. And, even if so radical a departure should be made as to omit the loops and run the car back and forth on a straight taut wire, there would be no "end of the way" in the sense in which McCarty used that term. If the car was at rest at the end of the way, Kenney's elevating bar could not be used to raise and attach a receptacle to the car. The car must first be in motion in order to operate the automatic stop and pick up the cash receptacles from the elevating bar. Kenney employs no locking device. The stop at the rear end of the car bar is raised only as the car approaches a station, and falls back as soon as the receptacles are picked up, so that the receptacles are merely hanging by hooks from a straight bar, liable to be knocked off by any obstruction—a thing that is intended to happen at the cashier's station. But if the bar and stop and hook were to be called a locking device, they do not comprise a lock of the McCarty class, which co-operates with the elevator to enable the salesman to raise and attach the receptacle directly to the car at rest at the end of the way. The Kenney elevating bar is not at the end of the way; it raises the receptacle to the side of the track, not to and against the car; and it is incapable of receiving and lowering the receptacle. On the opposite side of the track the returning receptacle slides down parallel guides. There is therefore no elevator for lowering the receptacle, beyond one in the sense in which a boy is using an elevator when he slides down a balustrade. Without going to details of construction, the Kenney apparatus is found wanting in the first, third, and fifth elements of McCarty's concept as herein defined.

McCarty was not the pioneer in building store-service apparatus. The prior art discloses various systems which employed from one to three of the elements of McCarty's combination, and it may be possible to find something to answer in a general way to each, though not in one combination; but nowhere prior to McCarty's patent is shown the combination of an elevated way (a separate way from the cashier's station to and ending at each salesman's station to be served, and incapable of connecting directly the cashier's station with all or several of the salesmen's stations), a car mounted to travel on the way, a receptacle detachably suspended from the car, a catch device for locking the receptacle to the frame of the car in the receptacle's sus-

pended position (a catch device of which necessarily one part is on the car and the other on the receptacle, so that the receptacle is locked to the car by being brought against it in the right position), and a separate elevator (of which neither track nor car nor receptacle forms a part) situated stationarily at the end of the way in position to receive the receptacle (an elevator distinguished from elevating appliances that are attached to and travel with the car or car and receptacle, and in such controlled position relative to that of the car when at rest that it may receive the receptacle when the receptacle is to be raised and attached to the car, and also when the receptacle is to be detached and lowered from the car), and constructed to raise or lower the receptacle to or from the car. Though novelty of combination does not establish invention (Interior Lumber Co. v. Perkins, 80 Fed. 528 [25 C. C. A. 613]; Kelly v. Clow, 89 Fed. 297 [32 C. C. A. 205]; Busell Trimmer Co. v. Stevens, 137 U. S. 423 [11 Sup. Ct. 150, 34 L. Ed. 719]), we think invention was displayed in modifying elements, as they were formerly known, so materially that they would co-operate, and in combining the modified elements into a new class of store-service apparatus.

It is contended that the file-wrapper and contents estop appellant from claiming more than the structural details of the apparatus. A careful examination has satisfied us that, so far from the applicant's acquiescing in the initial adverse opinions of the examiner, he constantly insisted upon a broad construction of his invention; that, when the examiner suggested that it was necessary to declare interferences on claim 1, the applicant asked that they be declared, but the examiner finally found that course unnecessary; that when the examiner, after argument, was insisting on certain references as anticipatory of claim 1, the applicant desired the record shaped so that he could appeal to the board of examiners in chief; that the examiner finally withdrew all references, and allowed claim 1 as it stands, and permitted the applicant to add to the specification, immediately preceding the claims, the paragraph that asserts the primary character of the invention.

Appellees also insist that the McCarty apparatus is not operative; that the patent is therefore void for want of utility. The record shows that appellant, owner of the patent, has never put the device upon the market. The record also discloses that appellant is the oldest and largest concern engaged in furnishing store-service apparatus. The failure to use McCarty's device might support the inference that it is inoperative, and also the inference that it is operative but that for commercial reasons appellant prefers to suppress the invention. The latter inference is supported, we think, by the other evidence in the record. We understand the experts to agree that the specification, applied to claim 1, fully and clearly describes an operative mechanism. From an examination of the patent and exhibited model, we concur in that opinion. Numerous witnesses establish that, before the application was filed, McCarty erected and operated a large model from which the drawings were made. It is true that it was susceptible of improvement, but that fact does not negative utility. Telephone Cases, 126 U. S. 1, 8 Sup. Ct. 778, 31 L. Ed. 863; Rogers Typographic

Co. v. Mergenthaler Linotype Co., 64 Fed. 799, 12 C. C. A. 422. Without appellees' or others' improvements upon McCarty, that system probably was commercially inferior to others owned and successfully introduced by appellant.

The McCarty patent, being found at the head of a class, though in a well-developed art, is entitled to a liberal range of equivalency. Consolidated Valve Co. v. Crosby Valve Co., 113 U. S. 157, 5 Sup. Ct. 513, 28 L. Ed. 939; Morley Machine Co. v. Lancaster, 129 U. S. 263, 9 Sup. Ct. 299, 32 L. Ed. 715; Nat. Hollow Brake-Beam Co. v. Interchangeable Brake-Beam Co., 106 Fed. 693, 45 C. C. A. 544; Crown Cork & Seal Co. v. Aluminum Stopper Co., 108 Fed. 845, 48 C. C. A. 72. So construed, claim 1 is undoubtedly infringed by appellees' apparatus. No question is made about the mechanical identity of the elevated way, the car mounted to travel thereon, and the receptacle detachably suspended from the car. The catch, like McCarty's, is of that class in which one part is on the car and the other on the receptacle, so that the receptacle is locked to the car by being brought against it in the right position. The part on the receptacle is a crossbar forming part of the handle. On the car is a pivoted dog with three detents. In its normal position, the middle detent is struck by the crossbar of the handle when the receptacle is raised to and against the car, whereby the lower detent slips under and clasps the crossbar of the handle, and is securely locked in that position by the upper detent's engagement with a pivoted block and spring, to which is fixed a trigger in such position that it is tripped and the receptacle released by the upward movement of the crossbar of the receptacle's handle. The notched upright arms of McCarty's receptacle are locked by the spring catch in the bell-mouth tubes of the car, and the catch is tripped by pressure being brought to bear upon the handle or trigger thereof. While there are considerable differences in structural details, we think the essential principles of the two locking devices are the same. Appellees' elevator, like McCarty's, is situated stationarily at the end of the way, and in such controlled position relative to that of the car when at rest that it may receive the receptacle when the receptacle is to be raised and attached to the car, and also when the receptacle is to be detached and lowered from the car. In appellees' device, a stirrup, adapted to fit under the crossbar of the receptacle's handle, by means of cords running through permanent guides raises the receptacle to and against the car in such controlled relation that the catch locks the receptacle to the car, and then the stirrup is automatically depressed by springs so as to allow the car to travel on its way. In McCarty's, a plate, adapted to fit under the bottom of the basket, by means of rods running through permanent guides raises the receptacle to and against the car in such controlled relation that the catch locks the receptacle to the car, and then the plate is automatically depressed by springs so as to allow the car to travel on its way. The main structural difference is that between the palm of the hand under a basket and the crook of the finger under the handle. In appellees' apparatus we find the elements of McCarty's claim 1, combined in the same way to effect the same unitary result. We doubt not that appellees' device, as made under patents No. 623,-

899, April 25, 1899, and No. 645,505, March 13, 1900, to Gipe, shows patentable differences in structural details; but appellees are no more entitled to use McCarty's invention without license than appellant is theirs.

The decrees are reversed, with the direction in each case to enter a decree in complainant's favor for an injunction and an accounting.