## CONLEY v. KING BRIDGE CO.

### (Circuit Court, D. New Jersey. December 18, 1909.)

**1.** PATENTS (§ 328*)—INFRINGEMENT—GUIDE FOR PUNCHING PRESSES.

The Conley and Conley patent, No. 701,544, for a guide for punching presses for punching holes in metal at variable predetermined distances, the purpose of the patented device being to secure accuracy in such spacing by means of separately adjustable stops, in view of the prior art, must be given a narrow and strict construction to sustain it, and be limited to the precise combination and elements described. As so construed, *held* not infringed.

**2.** PATENTS (§ 328*)—INFRINGEMENT—GAUGE FOR PUNCHING PRESSES.

The Conley patent No. 735,469, for a gauge for punching presses, construed, and *held* not infringed by machines made in accordance with Clarke patents, Nos. 739,060 and 799,302.

**3.** PATENTS (§ 56*)—ANTICIPATION—ANALOGOUS ARTS.

There is such analogy in purpose and function between a machine for punching paper and one for punching metal that the former may properly be considered in the metal-punching art.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 89; Dec. Dig. § 56.*]

---

In Equity. Suit by Thomas Conley against the King Bridge Company. On final hearing. Decree for defendant.

Connolly Bros. and James & Malcolm G. Buchanan, for complainant.

Kline, Tolles & Goff and Albert Lynn Lawrence, for defendant.

CROSS, District Judge. There are two patents set up in the bill of complaint, which are alleged to be susceptible of conjoint use, and to have been infringed by the defendant. The first, No. 701,544, dated June 3, 1902, for a guide for punching presses, was issued to Thomas Conley and John R. Conley. The second, No. 735,469, a gauge for punching machines, was issued August 4, 1903, to Thomas Conley. John R. Conley assigned all of his interest in the first patent to the complainant November 2, 1907. The alleged infringing devices of the defendant are made in conformity with two patents; the first, No. 739,060, issued September 15, 1903, to one Arthur Clarke, assignor to the complainant, for a spacing table, and the second, No. 799,302, issued September 12, 1905, to said Clarke, assignor to the complainant, likewise for a spacing table. The chief defenses set up are the invalidity of the complainant's patents and noninfringement.

In the first of the complainant's patents the patentee, in referring to it, says:

"This invention has relation to punching presses of that class known as 'power punching presses,' and has for its object the provision of means whereby a duplicate number of articles may be speedily and accurately punched with but little, if any, danger of false punching, and without the aid of skilled labor. This invention consists in the provision of an attachment or adjunct for punching presses, and consisting of an adjustable guide or stop, which can be set to guide and hold the metal to be operated upon by the punch, so that it will be punched at exact predetermined intervals, either the same or different distances apart. This invention further consists in the construction, combination, and arrangement of parts more fully described hereinafter and specifically pointed out in the claims.

"In the present and usual method of punching metal, where a number of duplicate pieces are to be punched, either a scale on the bed or anvil of the punch is utilized to regulate the distance apart of the punches, or else the work is laid out by the use of a wooden pattern which has been previously bored with the requisite number of holes in the desired position, and having been clamped to the metal. The places for punching are marked by indenting the metal at each hole with a center punch. Both of these methods are slow, inaccurate, and expensive, for the reason that the position of the metal under the punch must be regulated solely by the eye of a skilled mechanic, and even by the use of the utmost care exercised by the most skillful mechanic few, if any, of the punched places will be exact duplicates, thus requiring more or less hand-finishing after they leave the punch before they can be used. It is well known that in such work as bridge building, structural iron work for buildings, etc., it is desirable and necessary to produce a large number of pieces so accurately punched in duplicate as to be fitted together by rivets, bolts, etc., without any further work than what is done by the punch, and it is also well known that under the old method of punching this exact duplication is an impossibility. By the use of our improvements it is not alone possible to punch any number of pieces that are exact duplicates, but it is impossible without readjusting the guides to make a variation of even the fraction of an inch in the location of the punches."

That patent contains four claims, all of which are alleged to have been infringed by the defendant. They are as follows:

"1. The combination, with a punch or drill press, of a carriage, a reciprocating rod mounted on said carriage, and a series of separately-adjustable stops adapted to contact with said rod and stop the carriage at predetermined points.

"2. The combination, with a punch or drill press and a carriage for conveying metal into position to be operated on, of separately-adjustable stops for stopping and retaining said carriage at predetermined points and means for causing the carriage to be engaged by and disengaged from said stops.

"3. The combination, with a punch or drill press, of a carriage, means for holding work in position on said carriage, a series of separately-adjustable stops, for stopping said carriage at predetermined points, and a manually-operable detent carried on the carriage and adapted to engage with said stops.

"4. The combination, with a press and a movable carriage, of a guide for stopping said carriage, consisting of a rail or rod provided with adjustable stops and adapted to stop the movement of the carriage at predetermined intervals."

Upon inspection of the file wrapper of this patent, it appears that, as originally presented, it contained six claims, of which claim 6, now 4, was allowed by the examiner, while the remaining five were rejected as defining nothing patentable over patents to James Morgan, No. 167,461, for "an improvement in machines for punching boiler plates," and reissue to Morgan, No. 8,251, issued, respectively, September 7, 1875, and May 28, 1878. The five rejected claims were thereupon all amended. No. 4 as amended read as follows:

"The combination with a press and a carriage for regulating the position of articles to be operated upon by the press of movable and individually and independently adjustable stops for said carriage and a reciprocating rod mounted on said carriage and adapted to contact with said stops."

And thereupon it was argued in behalf of the applicants that—

"the stops are individually or independently adjustable, and hence the carriage may be stopped at irregular intervals."

The examiner, however, rejected, not only claim 4 as amended, but all of the other amended claims, whereupon they were canceled by the applicants, who inserted in lieu thereof the first three claims now appearing in the patent. An examination of the Morgan patents shows that substantially the only improvement, made thereon by the patent under consideration, was in the provision of separately adjustable stops which would stop the carriage at irregular predetermined points, and this was the purport of the argument made before the examiner in the Patent Office in behalf of the patentees when the application was under consideration. In the Morgan patents the carriage was provided with stops in the form of studs spaced upon and annexed to a lazy tongs, and, because they were all thus annexed, any movement of the screw which adjusted the tongs necessarily moved all of the stops, and hence they were not separately adjustable at variable intervals and independently, as are those of the patent in suit.

The complainant's expert in his testimony, however, further distinguishes the Morgan patent from the patent under consideration, because in operation the detent in the Morgan patent slips over the stops, while in the Conley and Conley patent it is brought directly into engagement with the stop. Very little importance, however, is to be attached to this distinction, because it is apparent that the movement of the carriage could, if desired, be readily reversed, as suggested in the

patent, each time the punching was effected. The Morgan patents are in the direct art, and seem to suggest all that the Conley and Conley patent shows, except possibly the separately adjustable stops, in which respect the latter is capable of a more close and accurate adjustment. The Roberts British patent No. 11,607, of 1847, however, provided an automatic mechanism in combination with a punching press for punching holes in metal at variable predetermined distances. The drawings and specifications of this patent are voluminous and complicated, but its consideration has been rendered comparatively easy by means of an enlarged illustrative drawing by the defendant's expert of the parts necessary to be considered in this connection. Roberts in his patent says:

"The racks, 5 and 17 (see Fig. 4), are drawn with three teeth in the length of a foot, which will divide plates to a four-inch pitch; but it will be obvious that for a different pitch the racks must be changed, and it may in some cases, such as when the pitch required is not an aliquot part of a foot, be necessary to alter the distance between the studs, 23."

The Perkins patent, No. 634,246, of 1899, in its essential features, except for the reverse direction of its feed, is almost a miniature of the patent under consideration. Complainant's counsel recognized its importance, provided it could properly be considered as in the prior art, which, however, was denied. As already intimated, it is, comparatively speaking, a small machine, and is designed for punching sheets of pasteboard or paper. In speaking of it, defendant's expert says:

"The Perkins device is provided with a punching apparatus, a carriage, mounted upon rails and adapted to approach or recede from said punching device, clamps for securing to the carriage sheets of material to be punched, stops which may be adjustably fixed in any desirable relation to each other, upon one of the rails, and adapted to gauge the feeding movement of the carriage, and therefore the distances between the several series of holes to be made by the punch in the sheet, and a spring bolt mounted upon the carriage, projecting into the path of the fixed stops, and adapted to engage them, and means for retracting said bolt temporarily, or for retracting and locking it permanently, out of position to engage the stops."

The main question is whether there is so little analogy between a machine for punching paper and one for punching metal as to eliminate the former from being properly considered in the metal-punching art. The defendant's expert claims that the working of sheets of paper and sheets of metal are analogous, and in support of his opinion gives the following reasons:

"Both materials are commonly treated or manufactured in a plastic condition between rolls; both are shaped or pressed between suitable dies; both are cut or trimmed by similar cutting mechanism; and, finally, the mechanism of the Perkins patent and the one to Conley and Conley, designed, respectively, for treating paper and sheet metal, strike me as being unusually similar, both in structure and operation."

The defendant thereupon contends that the Conley and Conley patent, in view of the Perkins patent, shows simply a case of analogous or double use, and for that reason discloses nothing of a patentable nature, and cites a large number of cases in support of its position, among them Busell Co. v. Stevens, 137 U. S. 423, 11 Sup. Ct. 150, 34 L. Ed. 719, wherein a cutter for cutting the teeth of metal

gear wheels was held to anticipate rotary cutters for treating the edges of boot and shoe soles, it appearing that there was no substantial difference between the patent then under consideration and a previous one for cutting metal gear, "except in the configuration of their molded surface"; also United States Co. v. Sturtevant Co., 125 Fed. 378, 60 C. C. A. 244, where the Circuit Court of Appeals for the First Circuit held a patent for cutting wood veneer to be anticipated by a machine for cutting leather board, and Wolff v. Du Pont Co., 134 Fed. 862, 67 C. C. A. 488, in which a process for expelling the solvent from smokeless gunpowder, was held to be anticipated by a similar process, described in an earlier patent, for expelling oils and spirit from india rubber.

Independently, however, of the authorities cited, it would seem reasonable and natural that one desiring to provide a machine for punching sheets of metal would consider machines adapted to punch other materials of a like form, since, if a machine were found which would punch one material, it could easily be adapted to punch any material capable of being punched, by simply increasing or diminishing its size and power as the case might require. There can be no doubt, therefore, that if the Perkins patent had been considered as a part of the prior art, as I think it might have been, it would have had the effect of either entirely blocking the Conley and Conley application, or of narrowing and restricting its claims still further, and almost, if not quite, to the vanishing point. Indeed, the defendant's expert, reading the claims of that patent upon the Perkins patent, finds the combination of the former fully anticipated by the latter.

It is further contended, in behalf of the defendant, that the patent under consideration has been, in all of its essential elements, substantially anticipated by what is known in the case as the King Bridge Company's spacing table, the Phœnix Iron Company's spacing table, and the Union Bridge Company's spacing table. Claim 4 of the patent in suit describes the mechanism of the King Bridge Company's spacing table, in that it is a punch or drill press in combination with a table having mounted thereon a moving carriage, and means for stopping the carriage, consisting of a rail or rod provided with separately-adjustable stops, adapted to contact with and stop the movement of the carriage at predetermined intervals. In the device in question the rail is perforated, and adjustable stops are adapted to be and are placed in holes therein provided for them, which check the carriage, and the sheet metal to be punched attached thereto, at predetermined positions for punching. This machine was in use by defendant for several years prior to 1900. The Phœnix Iron Company's spacing table has been in use since 1892. It is also provided with stop pins, adapted to engage the holes of a master plate secured on the spacing table; such holes being arranged at any desired intervals. This machine is perhaps even more like that described in the complainant's patent than is that of the King Bridge Company. The Union Bridge Company's spacing table was in use from 1895 to 1897, when the works of the company closed. This machine likewise has the essential feature of the patent in suit, although the stops are of a different kind and differently manipulated from those of the patent.

None of the patents or prior uses which have been referred to, however, appear to be susceptible of so nice and accurate an adjustment of stops as is found in the patent under consideration. Many other patents in the prior art, some of them of equal pertinency with those above mentioned, appear in the record and have been discussed by counsel; but it seems unnecessary to consider them at length, since it is already manifest that the claims of the patent must be narrowly and strictly construed in order that the patent be upheld. The field upon which the patentees entered was narrow. The claims must be restricted to the precise combination and elements illustrated and described; otherwise, the patent would not only be anticipated by other patents, but the defendant would be unable, under at least one of the claims, to use the machine which it successfully used for years prior to the issuance of this patent. The defendant uses a radically different kind of stop, and in a combination which had been used by it and others for a long period prior to the patent in suit. It is impossible, in view of the claims rejected in the Patent Office and the revelations of the prior art, to construe any of the claims in controversy so broadly as to include the defendant's machine. The patent was allowed over Morgan solely because of the separate adjustability of the stops by means of which punching might be performed at irregular and predetermined intervals. That was the only element of the combination regarded as novel; but, as it appears by the record that separately-adjustable stops of a different kind were old, the necessity arises of tying the defendant down to the particular construction shown and claimed.

It is, however, not deemed necessary to pass upon the question of the validity of the complainant's patent under consideration, since, with the claims construed as above stated, the defendant does not infringe. As already intimated, it has manufactured, and is using in its business, a machine constructed in accordance with the Clarke patent. In this patent is found a movable carriage adapted to travel upon rails and provided with clamping mechanism for drawing the sheet metal under the punch, an angle bar secured to one of the rails extending longitudinally with the track, with a horizontal flange in which are bored several series of holes to receive the stops. The stops shown by this patent are substantially the same as those shown in the King Bridge Company's and other spacing tables. They are, indeed, separately adjustable, but cannot be placed with that degree of accuracy which is possible in the Conley and Conley patent, according to which they can be placed at an infinite number of variable and irregular distances, while those of the Clarke patent can only be placed where the holes have been bored. As the holes, however, are placed in several rows, and the holes of each row staggered with reference to the holes of the other rows, the stops can be adjusted with some degree of accuracy.

The second patent in suit is admittedly but an improvement of the first Conley and Conley patent. The patentee says:

"That the object of the patented invention is to provide for a more accurate adjustment of the stops, and to prevent the same, when once adjusted, from being accidentally displaced."

The second claim only is relied upon. It reads as follows:

"The combination, with a press and a carriage for moving metal into different positions with relations to the press, of stop-blocks having diagonal ribs on their inner faces and a guide-rail upon which said stop-blocks are mounted, having diagonal grooves with which the ribs of the stop-blocks engage."

The principal elements in this patent, not shown and claimed in the Conley and Conley patent, consist in the diagonal ribs on the inner faces of the stop-blocks, and the diagonal grooves on the guide-rail upon which the stop-blocks are mounted, and with which the ribs of the stop-blocks engage. The defendant claims that this patent was anticipated by the prior art; but since, in my judgment, infringement has not been shown, that question will not be considered. The patentee has made the diagonal ribs and diagonal grooves and their engagement the feature of his patent. His description of his invention, as set out in his specifications and as illustrated by his drawings, coincide in every respect with his claim. He suggests no other form. His purpose was to secure both accuracy and firmness in the adjustment of the stop-blocks upon the guide-rail, and his invention apparently provides both. If he has unwisely limited his invention the fault is his own. He chose to stand or fall upon a single definitely described construction, and it is only by wholly eliminating the self-imposed limitations of his claim that he can even plausibly charge the defendant with infringement.

In Hendy v. Miners' Iron Works, 127 U. S. 370, 8 Sup. Ct. 1275, 32 L. Ed. 207, a cylinder having chambers or depressions in its outer surface was held not to be infringed by one having a smooth surface. Complainant's expert admitted that, if either the ribs of the stop-blocks or the grooves of the guide-rail were omitted from the Conley structure, the claims would not be descriptive thereof. This is what he said:

"Q. Omitting either the ribs, g², or the diagonal grooves, g, g, from the construction of Conley patent No. 2, such altered structure would fail to realize improvements set forth and claimed therein, would it not? A. If the ribs, g², or the diagonal grooves, should be omitted from the construction of Conley patent No. 2, that is to say, if the rail, E, and the blocks, F', have no overlapping surfaces or portions to prevent the unintentional displacement of the blocks, F. or to permit the fine or close adjustment thereof, the structure thus lacking the characteristics of what is shown and described and claimed in the Conley patent No. 2, in this regard, and what is shown and described in Clarke patent No. 2, would fail to embody what is set forth in claims 1 and 2 of Conley patent No. 2."

The defendant's alleged infringing device, as stipulated by counsel, is made strictly in accordance with the two Clarke patents, the grant of which of itself is prima facie evidence that the officials of the Patent Office did not consider it an infringement of the Conley patents. The defendant's stop-blocks have no diagonal ribs, and the flange upon which they are supported has no diagonal grooves. On the contrary, the inner faces of the stop-blocks and the flange of the supporting guide-rail with which they contact are perfectly plain. The controversy between the parties arises from the fact that the stop-block of the defendant has in it a diagonal slot through which a bolt passes and adjustably clamps the block to the guide-rail. The total inclina-

tion of this slot is required to be greater than the amount of offset between the corresponding holes in adjacent rows, so that the block, by being shifted forward or backward, may be clamped at any position intermediate of two holes. The holes just referred to are arranged similarly to those described in the first Clarke patent, and which have been hereinabove referred to. It seems obvious that Clarke's structure, with its plain surfaces, cannot hold the stop-block in place so securely as does Conley's, with its corrugated surfaces, nor does it have his micrometrical screw action for extreme accuracy in adjustment. It should be noted, however, at this point, that Clarke, in addition to securing his block in position so far as he can by means of the bolt passing through it, has provided other means for preventing its turning. In this connection he says:

"The blade, E, when depressed, extends across the various series of holes, so that it engages the block, H, directly opposite its clamping bolt, G. Wherefore the block has no tendency to turn."

Moreover, Clarke's block can only be readjusted by loosening the screw by which it is attached to the guide-rail, making the adjustment, and then retightening the screw. Complainant's counsel, however, contends that the Clarke device is but an equivalent of the Conley device. If, however, the limitations of the claim of the Clarke patent may be wholly disregarded, even then no equivalency in the two structures is apparent. The defendant's expert has pointed out with accuracy the distinctions between them in the following language:

"Again, I find that the Clarke spacing table employs no 'stop-blocks having diagonal ribs on their inner faces,' and mounts the stop-blocks therein shown upon a perfectly plain supporting flange, as opposed to the 'guide-rail upon which said stop-blocks are mounted, having diagonal grooves with which the ribs of the stop-blocks engage,' as called for by claim 2. Mr. Williamson asserts, on behalf of complainant, that the diagonally-slotted block, H, of the Clarke patent, which engages the bolt, G, mounted upon the flange, B, constitute the full equivalents of the construction specified in both of the claims quoted, if I understand his argument correctly; but I cannot share his view that the claims are realized in the Clarke device. It is apparent that the action of the block, H, of the Clarke patent, is no more than that of a wedge of the same inclination as the slot h in said block, and that the block, H, and the flange, B, are not secured together in a manner to avoid displacement, as they would be if they were provided with coacting ribs and serrated engaging faces."

For the reason, then, that the spacing machine of the defendant, made in accordance with the Clarke patents, does not infringe the Conley patents, or either of them, the bill will be dismissed, with costs.