CORNELL v. CHASE BRASS & COPPER CO., Inc.

No. 234.

Circuit Court of Appeals, Second Circuit.

April 20, 1944.

158

Henry J. Lucke, of New York City (Arthur K. Wing, of New York City, of counsel), for appellant.

Toulmin & Toulmin, of Dayton, Ohio (Seymour Scott Jackson and Frederick S. Duncan, both of New York City, and H. A. Toulmin, Jr. and Rowan A. Greer, both of Dayton, Ohio, of counsel), for appellee.

Before SWAN, CHASE, and CLARK, Circuit Judges.

CHASE, Circuit Judge.

This appeal is from a decree of the District Court in a suit for the infringement of United States Patent No. 2,025,-973, which was granted on December 31, 1935, to the American Radiator Company as assignee of the application of this plaintiff, as the inventor, filed June 6, 1934. The plaintiff has become the owner of the patent and no question is raised as to his being the proper party to sue thereon.

The patent was granted for a "Hollow Wrought Metal Body and Method of Making Same". Though its scope is by no means limited to commercially pure copper pipe fittings in the form of a T, it is convenient and adequate for present purposes to discuss it primarily in that aspect as the parties have done. The plaintiff relied on article claims 1 to 6 inclusive and on method claim 8. They were all held invalid and, if valid, not infringed.

The suit is the ordinary one for infringement and an accounting and for a preliminary and permanent injunction. The defendant added to its answer denying infringement a counterclaim under the Declaratory Judgment Act, 28 U.S.C.A. § 400, alleging that the patent was invalid and praying for a decree to that effect. To the issues of validity and infringement there is now added the denial of the plaintiff's motion to reopen the cause after trial to permit the introduction of additional evidence claimed to have been newly discovered.

The patent teaches that the hollow wrought metal body with which it is concerned is to be pressed out of a cold tubular blank of the metal. It is put in a die having the required interior size and conformation to shape the exterior and having a changeable mandrel and changeable punches, so positioned and shaped that the interior will be properly formed at the same time by the flow of the metal under pressure. The operation is completed by drilling and reaming out webs of metal left by the die forming process. Pressures of an order as high as from 100,000 pounds to 500,000 pounds per square inch are used, depending upon the size of the article made.

The die used to make a T, for example, is in the conventional split construction with suitable means for holding the halves in proper alignment in the well-known die press. Though the specifications are not limited to "a lateral pipe fitting of integral wrought metal predominantly of copper content," the claims in suit are so limited. Such copper pipe fittings are desirable for use with copper pipes or tubing where sweat joints are to be made, for their expansion under the application of heat in the making of the sweat joint is like that of the same material in the pipe and thus the proper clearance is maintained for the inrun of the solder under the influence of capillary attraction. As the amount of clearance in making a sweat joint is critical within comparatively small limits, it is essential that the fittings be hard enough to be stored in bins and handled in the ordinary way by pipe fitters without being so distorted that the proper amount of clearance will be disturbed.

The patentee secured this desirable hardness in his wrought copper T by a cold working of the metal to make it approach its maximum in that respect. As is well known, cold working so changes the grain of copper that the metal is hardened, and in making the patented T no heating whatever is used to lessen the hardness

so imparted. On the contrary, at the start of each successive stage in the process the metal is as hard as it was at the end of the previous stage.

By "stages" in this connection we mean the several applications of pressure to the metal in the die. The first takes place after the straight tubular blank has been inserted; the first mandrel or plug is in place in that part of the die in which the lateral branch is to be formed; and the first punches are in position with their conical inner ends within ends of the blank. The blank, of course, has been given the required length and side thickness to provide the metal content needed for the particular object to be made. Then quick pressure of the requisite amount drives the punches part way into the ends of the blank. As the diameter of the punches is smaller than the outside diameter of the blank by the amount of thickness which the walls of the finished fitting are to have, that amount of metal is left between the punches and the sides of the die as the punches advance toward each other. The excess metal in the blank is moved to form a solid mass between the conical ends of the punches, and some of it is pushed out around the end of the mandrel, which is tapered, and into the space between the mandrel and the sides of the die enclosing it. Thus there is the beginning of the formation of the lateral branch.

The next stage follows the removal of the first punches and of the mandrel and the insertion of others. The second mandrel has a rounded end and the second punches have cylindrical ends of reduced diameter. Again quick and high pressure is applied to the punches to drive them forward until they come so close to meeting that only a thin film of the metal is left between their forward ends. The metal flow thus induced forms more of the lateral branch.

The next stage is preceded by a removal of the mandrel only. In its place is inserted a punch having a rounded end and a diameter less than that of the mandrel removed. Pressure on that punch drives it toward the inner ends of the other two punches, which have been left in place, until there is but a thin partition of metal between the inner ends of the three punches. The displaced metal flows into the remaining space between the new punch and the sides of the die enclosing

it to fill that space and complete the formation of the lateral branch. Then all the punches are withdrawn and the film first mentioned is drilled out. When that has been done, the second film of metal is removed with a combined drill and reamer which forms a stop or shoulder as an abutment for the pipe end when the fitting is used, similar shoulders having been formed near the other ends of the fitting by the last punches there used.

What is now claimed to be new in this process is the use of the patentee's blank. As the appellant candidly admits in his brief, "his invention resides in the use of a tubular copper blank." That the prior art leaves no wider scope to be given to what he did from the standpoint of invention is made clear by the evidence in this record which shows, as was found by the trial court, that it was old to make articles of various shapes by the cold working of copper and other metals by means of dies and punches under pressure, and that many of these articles were hollow. It was likewise well known that metals commonly used to make pipe fittings could be similarly worked when heated and that the softening effect of heating would make the metal flow in the die more easily, i. e., upon the application of less pressure. Moreover, the effect of heat upon the grain structure of such metals was known, and where it was considered more important to obtain qualities imparted to the metal by cold working than to provide ease of metal flow by heat softening with its resultant effect upon the metal itself, the choice of methods was made accordingly. The general practice has long been that the softer metals are usually worked cold and the harder ones are worked heated.

Consequently, prior patents which disclose die pressure methods of making pipe fittings and the like out of metals long used in the manufacture of such articles are pertinent prior art though they advocate the use of heated blanks. United States Patent No. 689,204, granted to Larkin on December 17, 1901, is one of them. It shows metal movement in mass under pressure inside a die, applied to a blank of metal heated to a plastic state. Another example is No. 1,445,140, granted to Kellogg on February 13, 1923, which dealt with heavy pipe fittings and similar articles made from steel and other hard metals of high tensile strength.

160

■ Nor was it new to start with a cold tubular copper blank in making pipe fittings and to continue to the end without heating the metal. In the patent granted to Barthels on July 10, 1900, U. S. No. 653,279, such a tubular copper blank was forged by hand into a finished T. The patent in suit shows a method for starting with a like tubular copper blank in a die press and ending with such a finished T—coined by automatic machinery instead of being wrought by hand. Broadly speaking, this is not invention. Jones v. General Fireproofing Co., 6 Cir., 254 F. 97, rehearing denied 254 F. 970, certiorari denied 250 U.S. 643, 39 S.Ct. 494, 63 L.Ed. 1186. An old manual process carried out by means of power applied in an old way does not become a new method of manufacture simply by being transferred from hand to power. But the change from manual manufacture to machine production may require invention if it involves substantial changes in method. Thropp's Sons Co. v. Seiberling, 264 U.S. 320, 44 S.Ct. 346, 68 L.Ed. 708.

In deciding whether the plaintiff made such changes one must keep in mind that the deformation of a cold tubular blank in a die to make a pipe fitting was old. U. S. Patent No. 1,182,358, granted to Dies on May 9, 1916, shows that, and while Dies did not suggest the use of a tubular blank of commercially pure copper, his process may of course be carried out with blanks of any suitable material. He merely advocated the use of seamless tubing and asserted that "pipe fittings made in accordance with my invention may be made of lighter material than can malleable fittings, and still have equal strength." In another patent granted to Dies on the same day, No. 1,182,360, a reinforced pipe fitting made of seamless steel tubing or plate metal was claimed, and U. S. Patent No. 1,918,715, granted to Robinson on July 18, 1933, shows still another way to form a pipe fitting by deforming metal in a die press. Yet these methods are bending and bulging operations which do not compress and flow the metal as in the patent in suit, and if they could and should be performed on a tubular copper blank the process would more nearly resemble a change-over from hand to power in the Barthels patent, supra. Thus they do not resolve the question here.

These fairly close, though not wholly anticipating, approaches to what the plaintiff disclosed, which proved satisfactory in the fulfillment of a recognized need, do not furnish a ground for determining whether his solution of the problem amounted to invention, without a reference to the unpatented processes of the defendant in this art, which the record shows preceded his success. The defendant produced a copper T in 1932, before the plaintiff's conception date, which was pressed out cold in a die press from a slug or blank of solid copper. It did not, however, go into commercial production with this process and the trial judge found that what the defendant did was not a prior use but was an abandoned experiment. Though that conclusion is fairly debatable it has the support of substantial evidence and we adopt it.

Another claimed prior use by the defendant, however, was the employment of a die press with a solid round bar of copper to make hollow door knobs. In this process the first five deforming steps were taken while the copper was hot and at the end of the fifth step the part destined to form the knob proper as distinguished from the stem was cup-shaped. From this point the die-forming process was carried to completion with the copper cold. Taken as a whole, the process was one commencing with a solid hot copper blank and ending with the article finished cold. But this distinction is merely a superficial one. For present purposes the first five steps in the process merely produced a blank which was hollow at one end and the remaining steps were the deformation of that hollow cold end into the desired shape in a die press. It was, to be sure, a much simpler operation than the cold working of the tubular copper blank according to the specifications of the patent in suit, but we think that taken into consideration with the other prior art it shows that what the plaintiff did was clearly foreshadowed and that his particular choice of ways and means fell short of invention.

■ To amount to invention it must appear that the changes from the old were more than should and would be made by one skilled in the art whenever he cared to make them. This something beyond the skill of the calling is the contribution which will support the grant of a patent and will justify the limited monopoly which a patentee receives. Atlantic Works v. Brady, 107 U.S. 192, 2 S.Ct. 225, 27 L. Ed. 438. Pipe fittings in general are in

the class of simple products which have long been made and used in various sizes and shapes. Even those of commercially pure copper were not new before the patentee produced what he did as he did. Normally it does not amount to invention to shape a die in whatever way an article capable of being so pressed out requires. Karron v. Karron, 2 Cir., 66 F.2d 785. The selection of punches, mandrels and pressures suitable for the particular use to which they are to be put in the die ordinarily is in the same category. There must be some extraordinary change from the old to make variations in choice in such respects amount to more than the exercise of mechanical skill. And the same holds true in respect to the selection of blanks to use in the die.

It was known that in making a hard wrought copper fitting a tubular blank could be used, and it was obvious that in making a hollow product in a die a hollow blank would give the advantage of some predistribution of material which would cut down metal flow. That in turn would reduce the over-all pressure needed to complete the process and would make for less wear and tear upon everything subjected to the pressure. If it required no more ingenuity than that of a skilled mechanic to choose to employ a tubular copper blank in a die to press out a pipe fitting, when the patentee elected to do that he did not become an inventor simply because he did it first. Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58; Picard v. United Aircraft Corp., 2 Cir., 128 F.2d 632, certiorari denied 317 U.S. 651, 63 S.Ct. 46, 87 L.Ed. 524. Whether or not it did require more than that is a question of fact to be resolved with due regard for the state of the prior art. Ohmer Fare Register Co. v. Ohmer, 6 Cir., 238 F. 182. There was ample evidence to support the finding of the court below that it did not, and we agree that no invention was proved.

Though it may be unnecessary to do so, it will perhaps be worth while to point out that the District Court was right also in holding that there was no infringement. The six product claims in suit all cover "a lateral-provided pipe fitting of integral wrought metal predominantly of copper content" which has been "cold wrought to final status." Such a fitting has the hardness which cold working will give it undiminished by heating at any time from beginning to end; and it has that advantage, whatever it may be, without being impaired by structural defects caused by fractures due to exceeding the tensile strength of the metal while it was being cold wrought. This cold working, moreover, is not merely the flowing of metal while unheated but is the flowing of it without any intermediate applications of heat at all so that it becomes progressively harder under compression while still cold. Its hardness at the beginning of the second stage is what it was at the end of the first, and at the beginning of the third stage its hardness is the same as at the end of the second, and so on. It is, indeed, not only cold wrought but "cold wrought to final status", and was so claimed.

The defendant's product which is accused of infringing the article claims in suit is wrought while cold merely in the sense that the steps by which the metal is deformed and fashioned into the completed fitting are taken while the copper is cold. There are, nevertheless, necessary intermediate heatings to anneal the material and permit it to withstand the stresses set up within it by the kind of movement it is made to undergo. Thus at the beginning of each succeeding stage the metal is softer than at the end of the previous one because it has meanwhile been annealed by heating to impart to it qualities without which the deformation could not be continued without fracture, or serious danger of fracture, of the metal.

The defendant makes the accused articles in accordance with the process disclosed in U. S. Patent No. 2,198,643 granted to Wendel on April 30, 1940. For a blank it uses commercially pure copper formed into the shape of a test tube, which is enclosed in a die. The blank is at no time collapsed even partially, but instead hydraulic pressure supplemented by mechanical pressure against the end which at first was open, supplies the deforming force until the metal completely lines the interior of a die made in the shape of the exterior of the T or fitting being made. During this process the pressure is applied approximately ten times, and after each application the blank is taken out of the die and annealed by being subjected to heat of around 1000 to 1100 degrees F. to remove its brittleness.

In making its T the defendant puts the blank open end up in a die which closely fits around the outside of it and which has lateral cavities extending in opposite directions from the bottom, or closed end, of the blank. These cavities are of the size and shape of the exteriors of the laterals to be formed integral with the upright portion of the blank, which has walls which taper somewhat because they are thicker as they extend from the open to the closed end to provide the required metal content to make the fitting. The blank is then filled with fluid of a soapy nature and a punch with a relief valve is placed inside the open end and against the top of the liquid. Pressure applied to this punch drives it downward, and under the influence of the hydraulic pressure thus put into the bottom of the blank its sides in that area start to bulge out into the cavities in the die. Soon a shoulder on the punch engages the top of the blank and pushes the tube down to feed more metal into the cavities. At the end of this operation the punch and blank are removed from the die, the fluid is removed, the blank is annealed and put back in the die, a refill is made with the fluid, another punch is inserted and pressure is applied as before. After a succession of like operations, in the course of which four different punches are used, the metal has been pushed tightly against the whole interior of the die. It is then removed for the last time, the closed ends of the laterals are cut off, and all three ends are sized and given the proper shoulders to make them suitable to be attached to tubes or pipes by means of sweat joints.

The result is a fitting made of metal which has been repeatedly softened during manufacture and which has, between the heatings which softened it, been stretched and pushed into shape without the metal-to-metal squeezing which makes the patented T progressively harder as it is formed "cold wrought to final status" where it approaches the maximum hardness which cold working will give it. True it is that the patented T and the accused one are both hard enough for ordinary use, but by keeping all the hardness which the entire compression gives it the patented T has in the end substantially more of that quality than has the accused T. The results of the tests as shown by the record leave no doubt of this; and, though the so-called Rockwell test used and proved by the defendant has been criticized by the plaintiff, the record shows that it is a recognized method for determining the hardness of metal, and figures so obtained are competent evidence. Indeed, it is much like the Brinell test which the plaintiff seems to prefer.

Another difference between these fittings which is also traceable to the difference in the process of manufacture, by which the accused T is not "cold wrought to final status" and is not given the fineness of grain structure found in the patented T, is the capacity to resist pressures in operation. The patented T, being substantially harder, is substantially stronger in this respect.

■ The accused T cannot be made satisfactorily without annealing and it cannot have the characteristics of which annealing deprives it but which the patented T has in full measure because the blank from which it is made is compressed and extruded while being kept cold from start to finish. Consequently the accused fittings do not infringe the product claims in suit because they do not possess what the patentee chose to claim as some of the elements going to make up this product. There is not, therefore, the substantial identity which must be proved to establish infringement. Westinghouse v. Boyden Power-Brake Co., 170 U.S. 537, 18 S.Ct. 707, 42 L.Ed. 1136; Consolidated Engine Stop Co. v. Landers, Frary & Clark, 2 Cir., 160 F. 79; Vibroplex Co. v. J. H. Bunnell & Co., 2 Cir., 16 F.2d 975.

Nor is the process claim in suit infringed. It is apparent from the above description of the two methods that the steps taken differ in material respects. The patented process makes use of well known methods for coining by compressing comparatively soft metal in a die between parts of harder metal, in which spaces for metal flow are provided, while the defendant does not compress in like manner but elongates the material by internal hydraulic pressure as it is put, or pushed, in where it will be available for stretching to the extent the die will permit. This expansion of the metal takes place where the walls of the blank are not supported by the sides of the die, and though after the initial bulging is so produced the defendant does use external metal-to-metal pressure at the end of the blank originally open to help feed the material to be expanded into the cavities in the die, the remainder of the shaping is done by hy-

draulic action which at all times keeps the blank hollow. Consequently there is no displacement of the "metal from the blank as a solid mass laterally of the blank," which is one of the express limitations in the claim. Nor is the nonuse of this feature but a matter of choice on the part of the defendant. Since it uses its blank as the inside of its hydraulic pressure chamber, the dominant force in its process is the opposite of compression needed to deform the blank into a solid mass at any stage.

The remaining issue relates to the denial of a motion to reopen the trial for the introduction of evidence claimed to have been newly discovered and the denial of a motion to reconsider and reverse the ruling. The evidence consists of the U. S. Patent No. 2,309,099 granted to Crampton on January 26, 1943, and of a pamphlet entitled "Metallurgy of Copper." The trial judge denied the motion to reopen on the ground that the evidence "would not change the result of the trial in any respect." At most it was but cumulative on the issue of the difference or similarity in the working or forging of copper when hot and when cold. A review of the record in this respect shows that there was adequate support for the conclusion below. Neither the denial of the motion nor the refusal to reconsider was, therefore, an abuse of discretion.

Decree affirmed.