The NATIONAL MACHINERY
COMPANY

v.

The WATERBURY FARREL FOUNDRY
& MACHINE COMPANY, Tex-
tron, Inc.

Civ. No. 7094.

United States District Court
D. Connecticut.

June 22, 1963.

H. F. McNenny, D. W. Farrington,
Richey, McNenny & Farrington, Cleve-
land, Ohio, F. E. Callahan, Wiggin &
Dana, New Haven, Conn., for plaintiff.

Alan E. Steele, Middletown, Conn.,
Spencer, Rockwell & Bartholow, New
Haven, Conn., Willis H. Taylor, Jr., John
C. Oram, Jr., Pennie, Edmonds, Morton,
Taylor & Adams, New York City, for
defendants.

BLUMENFELD, District Judge.

This case came on regularly for trial
before the court, without jury; the
parties appeared by their respective at-
torneys of record; and the court, having
heard the evidence and argument of
counsel, and having considered the briefs
and proposed findings of fact and con-
clusions of law submitted by counsel,
makes the following findings of fact and
conclusions of law.

1. The plaintiff is an Ohio corpora-
tion with its principal place of business
in Tiffin, Ohio.

2. The defendant Waterbury Farrel
Foundry & Machine Company, a Con-
necticut corporation with its principal
place of business in Waterbury, Con-
necticut, is the original defendant in this
action. Its assets were acquired by
Textron, Inc., a Rhode Island corpora-
tion, which is continuing the business
under the name and style of Waterbury
Farrel Foundry & Machine Company
Division of Textron at Chesire, Con-
necticut. It is stipulated that Textron,

Inc. has assumed all liability, if any, which the original defendant may have to the plaintiff in this action.

3. The matter in suit involves more than $10,000.00, exclusive of interest and costs.

4. The two patents in suit issued on the same day, February 20, 1951 to The National Machinery Company · as assignee of the application of J. H. Friedman, the inventor.

5. Patent No. 2,542,023 was granted for a "Method of Making Nuts" on an application filed August 3, 1944.

6. Patent No. 2,542,864 was granted for a "Machine for Making Nuts" on an application filed April 19, 1946. It was issued to the plaintiff as a continuation in part of the application for the Method Patent '023.

7. The subject matter of the two patents in suit relate to a method and a machine for making nuts of standard configuration and sizes from cold steel wire stock by cold forging or "heading" with a plurality of dies and punches in a "cold header" machine having a transfer mechanism which enables the blanks from which the nuts are formed to be turned over between the successive operations performed by the several dies and punches.

#### The Method Patent

8. The '023 patent teaches a method for making hexagonal nuts out of cold wire.

9. First a length of wire somewhat longer than the thickness of the finished nut is cut or sheared off. This blank is of the required length and thickness to provide the metal content of the finished nut plus the waste slug which is punched out of the center at the final stage. The diameter of the wire is substantially equal to the width of the finished nuts across the flats (as distinguished from corner to corner).

10. It is evident to anyone in the art that wire of a diameter as large as can be readily inserted in the die minimizes the amount of deformation necessary to fill out the hexagonal corners of the sides of the die.

11. It is also evident to anyone in the art that as stations are added in these machines, the work done at each station decreases.

12. The blank is subjected to 5 similar successive operations called "stages" in each of which the blank is placed in a die and subjected to pressure from a cooperating punch so that it is progressively deformed until at the final stage a small slug of waste metal is punched out of the center leaving a nut ready for tapping.

13. In brief, these stages are:

(1) squaring up the ends of the cut off blank in the 1st die;

(2) pressing the blank into rough hexagonal shape in the 2nd die;

(3) dishing and doming the blank in the 3rd die;

(4) inverting the blank and flattening the end faces in the 4th die; and

(5) punching out the central slug.

14. After each stage, the blank is carried from one station to the next by an automatic transfer mechanism inverting the blank between stations wherever that is deemed desirable.

15. Appropriate variation in the shape of the die and the head of the knockout punch at the annular end at the 4th stage will result in a finished nut that is washer-faced, flat-faced or chamfered.

16. At this stage, the bottom of the die may be flat for a flat-faced nut. It may have a circular recess in the central area of the flat bottom for a washer-faced nut (See Fig. 5a) or a portion of the circumference may be dished to form a double chamfer nut.

17. The end product of both the method and the machine for employing it is a nut which, except for tapping, is finished in conformity to critical specifications defined and illustrated in the "Society of Automotive Engineers Standards" and the "Bolt, Nut and Rivet

Standards of the American Institute of Bolt, Nut and Rivet Manufacturers."

18. The final nut thus produced is not new in shape, material, dimensions, or other characteristics.

19. All claims of the method patent are in suit on the defendant's counterclaims for invalidity. The defendant has designated claims 5, 16 and 18 as being representative thereof.

20. The plaintiff relies on claims 8 to 14 inclusive, 17 to 19 inclusive, and 21 to 28 inclusive, and has designated claims 19, 25 and 27 as being representative thereof.

"19. The method of making nuts and the like comprising upsetting stock to form a blank having a rough polygonal outline, confining said blank in a polygonal die opening, upsetting said blank into concavo-convex form so as to force the metal of said blank radially outward against the polygonal wall of said die adjacent the face of said blank which becomes convex, flattening said blank in a polygonal die opening to force the metal of said blank radially outward against the polygonal wall of said die adjacent the opposite face of said blank, and thereafter punching an axial hole through said blank."

21. The remaining claims add nothing which is significant.

22. Somewhat less verbosely stated, the method claims the step of dishing or doming the partially formed hexagonal blanks into concavo-convex form, *so as to force the metal of the blank radially outward against the die wall* adjacent the convex face of the blank. The next step in claim 19 calls for flattening the blank in the die *to force the metal of the blank adjacent the opposite (concave) face radially outward against the die wall.* In claim 25, the blank is removed and turned over between the 1st step (stage 3) and the 2nd step (stage 4). In claim 27, the description of the shape of the bottom of the die to form a flat-faced nut is included as additional matter.

23. At the 5th or final stage, only the slug in the center is punched out without affecting the exterior surfaces of the sides or ends of the nut.

24. The punch and die to form the blank into the concavo-convex form are described in claims 7 and 16 as "a polygonal die having a bottom wall disposed at an obtuse angle to its side walls" (7); and "a punch having a face portion substantially complemental to said bottom wall" (16).

25. Of the 31 claims, 18 attribute the force which causes the metal of the blank to fill out the corners of the die at the 3rd and 4th stages *to the "bending" of the blank into the concavo-convex form* and to the subsequent "flattening" of the blank. The last 5 claims speak of *"flowing the metal"* but at only the annular flat portion and the corners formed by the annular flat portion and the polygonal side walls of the die. The remaining 9 claims (including claim 5 which the defendant has designated as representative) state that the blank is shaped "into concavo-convex form *so as to force the metal against the polygonal wall of said die adjacent the convex face of the blank."*

26. Whatever change in the shape of the blank occurs at the 3rd and 4th stages results from plastic deformation attributable only to the flow of the metal within the blank.

27. The blank does not *bend* into a concavo-convex shape, nor does it bend back into a flattened shape.

28. The way in which the external configuration of the initial blank is changed into that of a nut is by *plastic flow of the metal,* outward and downward into the corners of the die.

29. The concavo-convex form does not in itself contribute to the plastic flow.

30. In the first of the 2 steps in the preferred embodiment in the method patent where the blank is deformed into concavo-convex shape, there is a nose on the punch which "dishes" the top face of the blank when it is forced against it by pressure.

31. As the punch is forced into the blank, there is a very substantial flow of metal into the unconfined areas and, as the punch advances, the metal in front of the punch flows outward into the corners of the die, forward into contact with the concave bottom of the die, and a slight amount flows upward until checked by the shoulders of the punch.

32. In addition to the projecting nose on the punch, Fig. 4 accompanying the plaintiff's patent also illustrates a projecting nose on the head of the knockout pin which protrudes through the center of the annular end (bottom wall) of the die. This indents the center of the convex face of the blank as it is formed in the 3rd station.

33. This nose on the knockout pin assists the radial flow of metal in the blank to fill out the corners between the flat hexagonal sides of the die.

34. Neither the nose projection on the head of the knockout pin nor the radial flow of metal it produces are included in the claims of the patent.

### Prior Method Patents

35. A prior method Patent No. 1,-228,260 issued to Swenson May 29, 1917 for "The Process of Making Pressed Steel Nuts" was not cited as a reference and was not considered by the Patent Office during the prosecution of either of plaintiff's patents.

36. The Wilcox Patent No. 1,832,167 granted November 17, 1931 for "Method For Making Nuts, Bolts, Rivet, And Screw Blanks, And Other Articles", which is particularly concerned with both double chamfer and washer-face nuts, also was not considered by the Patent Office during the prosecution of either of the plaintiff's patents.

37. Both Wilcox and Swenson taught a method of nut forming within dies by the development of high pressure so as to cause metal flow by the application of a relatively small force by the use of a punch having a projecting nose or hemispheric point (in the case of Swenson) or by first doming both faces of the blank so that pressure is applied to only a portion of the face of the blank.

38. The patent to Clouse, No. 2,062,-640, issued December 1, 1936 entitled "Process For Forming Nuts And The Like" describes his invention to consist "of one or more cold working operations upon a blank to spread the metal radially into a polygonal die and to produce in either the same or subsequent operations radial and axial flow of the metal to substantially fill out the different parts of the die cavity, and finally punching out the metal in the center of the blank to form an axial hole." (Col. 2, lines 42–49.) This is accomplished by application of the same principle of metal flow that was carried out in the Swenson and Wilcox method, though with some qualifications in the execution of the principle in order to overcome difficulties inherent in the earlier methods. After chronicling those difficulties and the reasons therefor, the inventor, Clouse, relates:

"I have solved these difficulties in the cold working process of making nuts by directing the metal to fill out first one and then another portion of the blank in the dies and also by holding and acting upon the blank during each operation in such a manner that the metal is never completely confined, but may flow freely at all times in one direction or another so as to definitely limit the pressures developed in the metal to the pressure required to flow the metal into a free or open space and thereby to avoid excessive deterioration of the tools or the locking of the metal about the plungers or tools."

39. It was well known long before 1944 that the use of a projecting nose amplified the effect of force upon the punch because the smaller area of contact between the punch and the blank the greater the force exerted at the point of contact would be.

40. The application of this principle to the arrangement of shapes of punches and dies so as to contact the blank in only those areas where deformation or

the induction of metal flow was desired was also well known.

## Publications

41. An article published in "The Iron Age", issue of October 15, 1936, entitled "Evolution of a Nut" illustrates and describes the sequence of progressive deformation in the making of a hexagonal nut in a cold header machine manufactured by the defendant using dies and punches designed by it. This is referred to as the old Waterbury machine.

42. In the trade magazine "Steel" for October 16, 1939, an article entitled "Cold Forging Process Maintains Close Dimensional Tolerances" describes the operation of a "five-stage" cold forging machine for producing standard hexagonal nuts, almost five years before the filing date, August 3, 1944, of the Friedman "five-stage" method patent. The article states:

"With the use of carbide dies and inserts, extremely close dimensional tolerances can be maintained, and a fine surface finish produced in the as-forged part.

"A most interesting development is the cold forged nut. *This is produced in a five-stage cold forging machine from round wire in coils. The wire is cut off, then upset and extruded in several steps to produce the hexagonal nut blank ready for tapping* on an automatic tapper. *Most of the metal* either drilled or punched out by older methods *is extruded outward from the center to form the hexagon shape. This method produces a nut having accurate dimensions and a fine finish because these and other factors are accurately controlled by carefully made dies.* Greater strength results from cold working the metal in that portion which is finally threaded, and, particularly interesting, a nut is produced in *which crystal flow approaches the ideal for this type of product.*

\*    \*    \*    \*    \*    \*

"In fairness, it must be pointed out that much credit for development in the cold forging industry is due to co-operation of producers of steel and nonferrous heading wire, and to the makers of steel for dies. Without this splendid assistance, the new cold forging machines would be helpless." (Emphasis added.)

43. This article was written by Mr. A. E. R. Peterka, of Lamson & Sessions Co., which at that time had built and was operating a five-stage cold forging machine invented and designed by Mr. Frayer, one of its employees.

44. Patent No. 2,100,028 on that machine was issued to Frayer on November 23, 1937.

45. Use of dies and cooperating punches to effect a progression of deformations of a blank cut from cold wire stock to a hexagonal nut in 5 stages, including the inversion of the blank from one stage to the next, is clearly lacking in novelty or invention.

## Purported Advantages

46. The use of the plaintiff's method does not result in an increase of tool and die life over that obtained in earlier or different methods.

47. The use of its method does not require the use of less force than is required by different methods.

48. The use of its method does not result in the formation of nuts of better quality in any respect than is obtained by the use of other methods of making nuts by plastic deformation of metal.

49. At Republic Steel Co., a large producer of nuts for commercial use, both the plaintiff's and defendant's machines are used for that production. Its die designers, designing dies for use of the multi-stage method, do not employ the designs found in the tool books of any manufacturer, but design their own to comply with the Bolt & Nut Institute standards.

50. The defendant's old Waterbury four-position machine for making double chamfered nuts in use before 1931 is

still more efficient than either plaintiff's '864 or defendant's five-station machine for the production of chamfered nuts, and tools for it are less expensive than in the plaintiff's machine and method.

51. No evidence was introduced to show that anyone has sought or obtained a license to use the plaintiff's method.

52. Whatever commercial success the plaintiff may have had in the sale of its nut forming machines is not attributable to anything disclosed or claimed in either of its patents.

53. The claims of '864 do not involve invention over the prior art.

### Prior Public Use of Machine

54. In the latter part of 1943, a machine described and claimed in Patent No. 2,542,864 was built and publicly used at its factory in Tiffin, Ohio. On an order dated August 24, 1944, it offered to sell the machine to Russell, Burdsall & Ward with shipment November 10, 1944.

55. Not until April 19, 1946, more than two years thereafter, did plaintiff file application for its machine aggregation patent '864 designating therein:

"This application is a continuation in part of my copending application, Serial No. 547,849, filed August 3, 1944." (Col. 1, lines 5–7.)

56. In plaintiff's early application, filed August 3, 1944, there is no suggestion that Friedman had invented a "machine."

57. To the contrary, that application represented:

"* * * for simplicity in the mounting of the dies and tools the machine of the aforesaid Frayer Patent No. 2,100,023 is preferred."

58. There was no disclosure in the specifications or claims of the original '023 application of any machine invented by the patentee Friedman.

59. The only "machine" disclosed in the application was a machine invented by some one else.

60. The disclosure in Friedman's later application, filed April 19, 1946, is different from that in the first application, filed August 3, 1944, in that there is no support in the earlier application for the machine of Fig. 1 of the later application nor the basic parts thereof.

61. The application for the machine patent cannot be treated as a continuation in part of the earlier application.

62. The effective date of the machine aggregation of Patent No. 2,542,864 is no earlier than its filing date, April 19, 1946.

### The Machine Patent

63. Plaintiff relies on claims 7–11 of Patent No. 2,542,864 and has designated claim 11 as representative.

64. Claim 11 reads:

"In a machine for making nuts and the like wherein a length of material is advanced intermittently to cut off mechanism, which successively severs portions thereof to form blanks of predetermined lengths, which blanks are thereafter subjected to successive pressure operation, a pair of work stations comprising sets of cooperating punches and dies to perform successive pressure operations on the same blank; means for presenting blanks to the first of said work stations; the punch and die set of said first work station including a peripheral die side wall and end walls, one on the punch and one in the die lying at least in part in axially spaced concentric zones of equal radii, one of said end walls forming an obtuse angle and the other an acute angle, with the peripheral die side wall; transfer means inverting and transferring blanks successively from said first work station to said second work station; the punch and die set of said second work station including a peripheral die side wall and end walls, one on the punch and one in the die, the end walls having annular peripheral portions substantially perpendicular to the side wall."

65. As previously indicated in findings 41, 42, 43, 45 and 50, four and five-

station machines having cooperating punches and dies to progressively deform the blank after it has been sheared and transfer mechanisms for inverting the blank from one station to the next were in operation producing washer-face, chamfer-top, and flat-face nuts long before the '864 patent in suit was filed.

66. Plaintiff's method Patent No. 2,-542,023, filed August 3, 1944, relates:

"The dies and tools shown may be mounted in a multiple station transfer header with all of the dies mounted in the bed frame and the cooperating tools carried by a reciprocating header slide, and with a transfer mechanism to carry the blanks from each station to the next and to turn the blank over between each two successive operations. Such a machine is disclosed and claimed in the patent to Frayer No. 2,100,028. The invention, however, is not limited to such a machine, as the method of this invention may be carried out in a plurality of separate machines, by hand, or in one or more multiple station headers of other types, such as the machine disclosed and claimed in the patent to Clouse No. 2,026,823. Similarly, the novel dies and tools of this invention may be mounted in any desired machine or machines, or may be manipulated by hand. For maximum economy of operation, however, it is preferred to utilize a machine which performs all of the operations without intermediate handling, and for simplicity in the mounting of the dies and tools the machine of the aforesaid Frayer Patent No. 2,100,-028 is preferred."

67. The plaintiff acquired the Frayer Patent No. 2,100,028 from Lamson & Sessions in 1940.

68. The Frayer Patent disclosed a five-station cold forging machine with dies mounted in the bed frame and having a reciprocating header slide carrying cooperating punch tools, with a transfer mechanism to carry blanks from each die station to the next and to turn the blanks over between nut forming operations.

69. The patent to Clouse, No. 2,026,-823, also discloses and claims a machine with multiple station headers of another type than Frayer's for the production of nuts by cold forging.

70. Plaintiff's machine differs from the old Lamson & Sessions (Frayer machine) only in that it has a combination of a different punch and die set at the 3rd and 4th stations.

71. Using an old transfer means for turning the blanks over between those stations in a machine that was old does not involve invention.

72. Plaintiff's machine patent represents nothing more than the adoption of the design of the No. 2 Lamson & Sessions' Nut Machine (Frayer) which plaintiff copied after it acquired the Frayer Patent No. 2,100,028 from Lamson & Sessions in 1940.

73. More than one such machine was built by Frayer at Lamson & Sessions between 1935 and 1940 and put into operation there.

74. Plaintiff, by improvement of the tools and dies as one element of the old cold header, i. e. the Lamson & Sessions' Nut Machine (Frayer), the construction and operation of which is otherwise unchanged, may not, in effect, repatent the old Lamson & Sessions' Nut Machine (Frayer) with its tools and dies substituted for those of Frayer.

75. Apart from the tool and die sets at the 3rd and 4th stations, there is no difference between the earlier Lamson & Sessions' (Frayer) Machine, and any element of a machine disclosed or claimed in '864.

76. It is found from the testimony of Mr. Odin Werther, Chief Engineer, Bolt & Nut Division of Republic Steel, that the old Waterbury double-dome four-station machine differs from the five-station machines of both parties only in that it had one less station.

77. The addition of another header station does not involve invention.

78. The following prior art patents and prior publications were offered and received in evidence:

### Prior Patents

| | | |
|---|---|---|
| Burbank | 1,892,445 | (Ex. 114) |
| Clouse | 2,026,823 | (Ex. 8) |
| Clouse | 2,062,640 | (Ex. 92) |
| Frayer | 2,077,519 | (Ex. K–1) |
| Frayer | 2,080,850 | (Ex. K–3) |
| Frayer | 2,100,028 | (Ex. 7) |
| Frayer | 2,226,399 | (Ex. 93) |
| Friedman | 2,030,290 | (Ex. 18) |
| Friedman | 2,052,760 | (Ex. 32) |
| Friedman | 2,396,995 | (Ex. 13) |
| Harvey | 2,015,596 | (Ex. K–2) |
| Swenson | 1,228,260 | (Ex. 90) |
| Wilcox | 1,135,239 | (Ex. 114) |
| Wilcox | 1,550,996 | (Ex. 114) |
| Wilcox | 1,832,167 | (Ex. 91) |
| Wilcox | 1,934,752 | (Ex. 114) |
| Wilcox | 1,957,923 | (Ex. 98) |
| Wilcox | 1,963,572 | (Ex. 114) |
| Wilcox | 2,069,511 | (Ex. 114) |
| Wilcox | 2,105,385 | (Ex. 114) |
| Wilcox | 2,205,507 | (Ex. 114) |
| Wilcox | 2,393,850 | (Ex. 114) |
| Wilcox | 2,547,801 | (Ex. BB) (1945) |
| Wilcox | 2,583,677 | (Ex. CC) (1947) |

### Prior Publications

"Principles of Manufacturing Materials and Processes"

McGraw Hill

Campbell                    (Ex. 83)

"Plastic Working in Presses"
Preface to Third Edition
(pp. 12, 81, 83)
Crane                       (Ex. 84)

"Hot Press and Upset Forging"
Cleveland Symposium

Friedman                    (Ex. 19)

"Hot Pressing and Machine Forging,
   Developments in Methods and Equipment"
The Metal Industry

(pp. 47–50)
Friedman                    (Ex. 21)

"Machinery by Pressure"
S. A. E. Journal

Vol. 30, No. 2
Friedman                    (Ex. 20)

| | |
|---|---|
| Handbook of S. A. E. | |
| 1938 Edition | (Ex.  V) |
| Fasteners | |
| Vol. 3, No. 2 | (Ex. L–3) |
| "Cold Forging Process Maintains Close Dimensional Tolerances" Close Steel | |
| (pp. 110 & 112) Peterka | (Ex.  22) |
| Advertisement Revere Brass & Copper Co. | (Ex.  89) |
| "Cold Forging" Steel | (Ex.  85) |
| "Nut Blanks" Fasteners | |
| Vol. 3, No. 2 (pp. 10–13) Smith | (Ex.  82) |
| "Automatic Nut Forming Machine" Waterbury Farrel Foundry & Machine Co. | |
| Pamphlet Nos. 884–A, A1, A2;  930–A | (Ex.  35) (Ex. A–1) (Ex. A–4) |
| "Automatic Nut Machines For Making Cold Pressed Nuts" Waterbury Farrel Foundry & Machine Co. | |
| Circular No. 788–A–2 | (Ex.  40) |

---

### Conclusions

1.  The court has jurisdiction of the patents and the subject matter of the action.

2.  All of the claims of the U. S. Patent 2,542,023 for a method of making nuts issued to the plaintiff, assignee of John H. Friedman, February 20, 1951, are invalid for want of invention over the art known as of the date of the application for the patent.

3.  U. S. Patent 2,542,864 is invalid because of the public use of the machine described therein by the defendant more than one year prior to April 19, 1946, the date the application for it was filed.

4.  Patent 2,542,864 is not entitled to the benefit of the earlier filing date of August 3, 1944, the filing date of the application Serial 547,849 on which Patent 2,542,023 was granted.

5.  All of the claims of the U. S. Patent 2,542,864 issued to the plaintiff, assignee of John H. Friedman, are invalid for want of invention.

6.  In view of the determination of the invalidity of both patents, there is no need to consider the issue of infringement thereon.

7.  The complaint is dismissed with costs to the defendant.

8.  The defendant's counterclaim for a declaratory judgment of invalidity is granted.

### Discussion

This action is for alleged patent infringement.  Jurisdiction is based on a federal question.

The patent count is based on U. S. Patent 2,542,023 for a method for making nuts issued to the plaintiff February 20, 1951 on an application filed August 3, 1944 and U. S. Patent 2,542,864 for a machine for making nuts which was also issued February 20, 1951 on an application filed April 19, 1946 as a continuation in part of the application for the method patent. The facts and conclusions have been separately found.

The principal defense on the merits, and also the basis for the defendant's counterclaims for a declaration of invalidity of both patents, is denial of invention over the prior art.

The subject matter of the two patents in suit relates to a method and a machine for making nuts of standard configuration and sizes from cold steel wire stock by cold forging or "heading" with a plurality of dies and punches in a "cold header" machine having a transfer mechanism which also turns the blanks, from which the nuts are formed, over between the 5 successive operations performed by the several dies and punches.

A five-station nut forming machine was built at Lamson & Sessions by Frayer during the 1935–1940 period (Patent No. 2,100,028). The Frayer machines were five-station machines which made cold forged nuts out of round wire. Its use was described in an article in Steel for October 16, 1939, authored by A. E. R. Peterka of Lamson & Sessions:

> "A most interesting development is the cold forged nut. *This is produced in a five stage cold forging machine from round wire in coils.* The wire is cut off, then upset and extruded in several steps to produce the hexagonal nut blank ready for tapping on an automatic tapper. Most of the metal either drilled or punched out by older methods is extruded outward from the center to form the hexagon shape. *This · method produces a nut having accurate dimensions and a fine finish because these and other factors are accurately controlled by carefully made dies.* Greater strength results

from cold working the metal in that portion which is finally threaded, and particularly interesting *a nut is produced in which crystal flow approaches the ideal for this type of product.*" (Emphasis added.)

The operations of this No. 2 Lamson (Frayer) nut machine is substantially that of the patents in suit; namely, cutoff, then (1) sizing; (2) rough hex; (3) further hex and indent; (4) finish hex and further indent; and (5) pierce. On February 7, 1940, a few months after the Peterka article was published, the plaintiff became the owner of the Frayer patent by assignment from Lamson & Sessions.

Against the background of these examples in the prior art taken from the evidence introduced in this case of a method and machine for cold-forming nuts from cut off blanks of wire stock by multi-stage die pressure described and disclosed (1) in a printed publication; (2) in a patent issued more than one year before Friedman filed his application; and (3) in use before that time, the plaintiff relies chiefly on the fact that the patents in suit were issued and on commercial success.

### Statutory Presumption

■ Although each one of the enumerated facts qualify as prior art, 35 U.S.C. § 102(a) (b), in testing whether the plaintiff's work satisfies the standard of inventive advance required by 35 U.S. C. § 103, plaintiff must be given the benefit of a presumption of validity. 35 U.S. C. § 282. As recently as March 1, 1963, our Court of Appeals in Gross v. JFD Manufacturing Co., 314 F.2d 196 at p. 198 (2 Cir., 1963), in referring to 35 U.S.C. § 282, said: "We recognize that there is a presumption, which is rebuttable," in favor of a patent. The court went on to say 314 F.2d at p. 198:

> "The balance was recently struck by this court in Lorenz v. F. W. Woolworth Co., 305 F.2d 102, 105 (2 Cir., 1962):
>
> " 'Appellant places great weight on the presumption of validity at-

tached by statute to a duly issued patent (35 U.S.C. § 282 (1958)). The presumption of validity relieves the patent holder of the burden of establishing that validity as a requisite for the successful maintenance of an infringement action, and places the burden of establishing invalidity on the alleged infringer who asserts it. International Carrier-Call & Television Corp. v. Radio Corp. of America, 142 F.2d 493, 495 (2d Cir. 1944); Western States Mach. Co. v. S. S. Hepworth Co., 147 F.2d 345, 348 (2d Cir.), cert. denied, 325 U.S. 873, 65 S.Ct. 1414, 89 L.Ed. 1991 (1945). More than that, *the most that can be said of the presumption is that it requires that reasonable doubt on the question of validity be resolved in favor of the patent holder.* See Mumm v. Decker & Sons, 301 U.S. 168, 171, 57 S.Ct. 675, 81 L.Ed. 983 (1937). *The statute does not require that the presumption be accorded the weight of actual evidence or that the use of the presumption should affect a decision of invalidity that would otherwise be reached with confidence.* This court has recognized the unavoidable obstacles to an accurate and impartial decision that are inherent in *ex parte* proceedings in the patent office, Guide v. Desperak, 249 F.2d 145, 148 (2d Cir. 1957). *We cannot properly allow decisions of that office to alter the preponderance of the evidence on the question of validity.* See Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 156, 71 S.Ct. 127, 95 L.Ed. 162 (1950); In re Thomson, 26 App.D.C. 419, 425 (1906); cf. Lyon v. Boh, 1 F.2d 48 (S.D.N.Y.1924) (L. Hand, J.), rev'd, 10 F.2d 30 (2d Cir. 1926).' " (Emphasis added.)

### Method Patent

Turning then to the proof, the plaintiff's evidence and argument concentrated upon a contention that its method invention which is injected into the narrow area of the art resides in shaping the dies and punches at the 3rd and 4th stages to cause dishing and doming the partially formed hex nuts at stage 3 into a concavo-convex form, which particular form causes the *blank itself* to act as a force multiplier to force the metal of the blank radially outward against the die wall adjacent the convex face of the blank—and, the inversion of the blank into the die at the 4th die station where the step of flattening the concavo-convex blank, again by reason of its form causes the *blank itself* to act as a force multiplier to force the metal of the blank radially outward to fill out the corners of the die. That this is what Mr. Friedman believed to be his invention is beyond question.

In order to better understand what there is in this concavo-convex shape that Friedman regarded as the invention which he was required by the second sentence of 35 U.S.C. § 112 to "particularly point[ing] out and distinctly claim[ing]", resort may be had to the specification. The specification of the method patent '023 emphasizes:

1. *"shaping a blank* with respect to a die *to cause the blank itself to act as a force multiplier."* Col. 1, lines 18–20.

2. "when the blank is upset into the die *the blank acts as a force multiplier."* Col. 1, lines 38–40.

3. *"In the preferred embodiment* this action is obtained in one step *by upsetting a blank which has side walls substantially perpendicular to its end face* into a die *with a generally concave bottom,* the side walls of which form an obtuse angle with the adjacent portions of the bottom wall of the die. The blank is upset by means of a punch *having a generally convex face* producing a dished or concavo-convex blank." Col. 1, lines 44–52.

4. "In the upsetting action the sidewalls tend to retain their original angular relationship with the

faces of the blank so that the metal is pressed radially outward with great force in the region of the corner between the side walls and the bottom face of the die *by a leverage action within the blank itself*." Col. 1, lines 52–55; Col. 2, lines 1–4.

5. "The blank is again upset, and the corners adjacent the concave face are forced strongly outward *by a toggle or leverage* action." Col. 2, lines 11–14. (Emphasis added.)

Friedman sums it all up in one sentence in Col. 7, lines 54–63:

"The dishing operation on the blank illustrated in Fig. 4, and the subsequent flattening of the dished blank illustrated in Fig. 5, act as force multipliers on the metal of the blank adjacent the juncture of the side walls and bottom wall of the die openings so that the metal is caused to fill out the corners of the dies with a minimum of pressure applied to the front face of the blank by the punches."

Although he can supply his own vocabulary with respect to claims and specifications, Marshall v. Proctor & Gamble Mfg. Co., 210 F.Supp. 619, 627 (D.Md. 1962), "and to a degree bind the art upon them", he may not thereby transcend physical laws. Electric Storage Battery Co. v. Shimadzu, 123 F.2d 890, 897 (3 Cir., 1941) conforming to mandate, Electric Storage Battery Co. v. Shimadzu, 307 U.S. 5, 59 S.Ct. 675, 83 L.Ed. 1071 (1939). Although a scientific explanation cannot be patented in any event, DeForest Radio Co. v. General Electric Co., 283 U.S. 664, 684, 685, 51 S.Ct. 563, 568, 569, 75 L.Ed. 1339 (1931), nevertheless—

"A discovery or devising must *add* something of significance, though not necessarily very much, to scientific knowledge if it is to take on the quality of an invention under a statutory scheme which gives the inventor, for a number of years, a legally protected monopoly in a legal order which generally abhors monopoly." Packwood v. Briggs & Stratton Corp., 195 F.2d 971, 973 (3 Cir., 1952), cert. denied 344 U.S. 844, 73 S.Ct. 61, 97 L.Ed. 657. (Emphasis added.)

To determine whether Friedman had won some grain of order out of the unknown in the field of metallurgy, Prof. Robert B. Gordon, a distinguished scientist,[1] who was a witness for the defendant, went to the heart of what Friedman said he had found. He tested the concept that the blank itself acts as a force multiplier with appropriate instruments, some of which were newly created by himself. He analyzed the differences in the grain structure of the blanks after the several stages of deformation with microphotographs. His testimony fully explained that "bending" did not occur, that "toggle action" did not occur, that "leverage action" did not occur, and that the shape of the blank did not operate "to cause the blank itself to act as a force multiplier." Perhaps it was permissible for Friedman to urge these ambiguities before the Patent Office, but without offering some discernible physicial evidence to show how his concept squared with what he claimed he discovered leads me unhesitatingly to agree with Prof. Gordon. Surely, it is by now clear that, at least with respect to inanimate things, no tricks are played upon the laws of physics. In an analogous situation, the Supreme Court reversed a decision of validity, stating:

"In short, there is neither theoretical nor practical demonstration of any such phenomenon as the owner of the patent asserts." Powers-

1. Prof. Gordon (B.S. Yale, 1952; D.E. Yale 1955); Associate Professor of Metallurgy at Yale University where he teaches metallurgy to both undergraduate and graduate students. He is also the principal investigator on three government metallurgical research projects sponsored by the Department of Defense and are sponsored by the National Science Foundation.

Kennedy Co. v. Concrete Mixing & Conveying Co., 282 U.S. 175, 185, 51 S.Ct. 95, 99, 75 L.Ed. 278 (1930).

I regard Friedman's concept as wholly inaccurate. Taken alone, the inaccuracies in Friedman's concept "greatly weaken, if they do not completely neutralize, the statutory presumption of validity arising from the mere issuance of the patent." Marshall v. Proctor & Gamble Mfg. Co., supra, 210 F.Supp. p. 633.

There is not much doubt that the patentee, Friedman, himself knew that the concept he urged before the Patent Office was not sound. In fact, Fig. 4, which he inserted to illustrate the concavo-convex blank produced at stage 3, the 1st of the 2 steps of his method patent '023, shows an indentation in the central area of the so-called convex face, caused by a projecting nose on the head of the knockout pin in the center of the bottom of the die, which shaped that face into something far removed from a pristine convex face.

Furthermore, he testified:[2]

"Q.  *So that the indenting has nothing to do with the flow of metal in the process of the formation of the concavo-convex relationship* at Station 4 [stage 3] of your patent? Defendant's Exhibit 1 * * *, is that correct?

"A.  *No, that's not correct.*

  *   *   *   *   *   *

"Q.  Is it your contention *that the absence of that indentation* has to do with the more complete filling out of the corners, and the sharpness of the sides of the hexagonal nut?

"A.  I feel that *the indentation contributed to the quality of the nut,* or to tool life, or both. *The absence would be the converse, of course.*

"Q.  But you made no measurements, or specific investiga-

tions, to find out how much of a contributing factor the indentation, or the absence thereof makes in respect to the formation of a nut in the manner illustrated at Fig. 4 of your patent. Defendant's Exhibit 1 * * *, is that correct?

"A.  There was no occasion to make any specific, definite measurements of that particular feature.

"Q.  But, nevertheless, you are here willing to state today that the absence of the indentation * * * *would not,* in fact, allow the same results as you disclose in Defendant's Exhibit 1 * * *?

"A.  *I very much doubt it."* (Emphasis added.)

While it may not be material to the plaintiff's alleged invention to indent the bottom face in the 3rd stage, not only is it a fact that the bottom face never becomes convex (I have used the expression "bottom face" to identify the end first inserted into the die at any stage.), but the introduction of indenting action to the bottom face causes the metal to flow radially and also shortens the axial length of the central portion of the blank which is punched out at the 5th stage, all as taught by Clouse, Patent No. 2,062,-640, issued December 1, 1936. Even with the admittedly favorable effect on deformation of a blank to make a nut which this disclosed, but unclaimed, indentation of the bottom of the blank at the 3rd stage produces, the evidence established that in making nuts by following the plaintiff's method, augmented by this additional feature, no improved results are obtained.

### Purported Advantages

In quite the same way, the plaintiff failed to introduce any measurements, experience records, tests or specific in-

2.  This testimony given at the pre-trial deposition of Mr. Friedman, who had died before the trial, is an example of one of the advantages of pre-trial discovery.

vestigations to counter the defendant's refutation of the plaintiff's "long felt want" contentions that the '023 method resulted in increased tool and die life or required less pressure than when other dies and punches were used. Its contention that its method and machine achieved an increase of 53% in the quantity of nuts produced per man hour at a saving of 80%· in scrap loss rested on a comparison not with Frayer's, Clouse's, or the defendant's, but with an entirely different method, consisting of punching blanks out of flat bars and then machining them with cutting tools—or of milling nuts from hexagonal bar stock on automatic screw machines.

## Invalidity

If discoveries to be patentable must "promote the Progress of Science and the useful Arts", U. S. Const., Art. I, § 8, Friedman has missed the mark. Stripping the scientific theory or principles which he thought were involved in the method, and measuring his alleged discovery against the established scientific knowledge, what occurs at the 3rd and 4th stage of his method is attributable only to "metal flow" or plastic deformation of the metal blank induced by minimizing the area of contact between the punch and the blank and the blank and the die so as to amplify the force with which the blank is struck. What has been learned before, must not be forgotten. It is clear that there was nothing new in the general method of forming a polygonally shaped nut blank from a cylindrical blank by flowing the metal into that shape by means of dies and punches under pressure. Cornell v. Chase Brass Copper Co., 142 F.2d 157 (2 Cir., 1944); Algren Watch Findings Co., Inc. v. Kalinsky, 197 F.2d 69, 71 (2 Cir., 1952). There was nothing new in any step in any of his claims. His method was directed to the same end as those followed long before by Lamson & Sessions and by the defendant. All he did was to put other punch and die sets at the 3rd and 4th stations of the Lamson & Session machines. Whatever differences there may be between the shape of

the dies and punches which he describes and their use at the 3rd and 4th stages of his method and those used in the prior art method of cold nut forging, which was no different, would have been obvious at the time to a person having ordinary skill in the art. See 35 U.S.C. § 103.

## The Machine Patent

### A. Effective Date.

■ The attempted compliance with § 112's requirements for a description in the '023 application of his "invention" insofar as it was a "machine" is all embraced by use of an improvised shorthand, to wit:

> "Such a machine is disclosed and claimed in the patent to Frayer No. 2,100,028" Col. 3, lines 27–28.

and for "the best mode contemplated by the inventor of carrying out his invention", which § 112 also requires to be described, see Application of Gay, 309 F.2d 769, 772, 50 CCPA —— (1962),

> "Similarly, the novel dies and tools of this invention may be mounted in any desired machine or machines, or may be manipulated by hand. For maximum economy of operation, however, *it is preferred to utilize a machine which performs all of the operations without intermediate handling,* and for simplicity in the mounting of the dies and tools, *the machine of the aforesaid Frayer Patent No. 2,100,028 is preferred."* Col. 3, lines 35–43. (Emphasis added.)

Because he had become the owner of the Frayer patent in 1940, there was good reason for him to pay it such tribute. This is borne out by the fact that on March 23, 1951, after the '864 patent had issued to him, the plaintiff relied only upon the legal protection he had obtained by purchase, because he warned the defendant that it was infringing the Frayer Patent No. 2,100,028 and made no charge then that the defendant was infringing either of the plaintiff's patents here in suit. The doctrine of continuity which entitles the plaintiff to rely on 35

U.S.C. § 120 to antedate the public use more than one year before his later application was filed "broadly depends upon whether the substituted application is for the same invention as that disclosed in the original application." General Electric Co. v. Continental Fibre Co., 256 F. 660, 664 (2 Cir., 1919); Good Roads Co., Inc. v. Charles Hvass & Co., 70 F.2d 625, 627 (2 Cir., 1934); see Oelbaum v. Lovable Co., 211 F.Supp. 594, 602 (S. D.N.Y.1962). Since the only machine in the patent application described "in the manner provided in the first paragraph of § 112 of this title" was described as being embraced in the disclosures of Frayer and of Clouse, and not as one of Friedman's own invention, logic compels the conclusion that the machine which is the subject matter of the later application must have been something new in order to be patentable over them. Certainly, the parent application gives a person skilled in the art no guidance sufficient to make a turnaround transfer mechanism unless he goes to Frayer's patent. Although the later ('864) application contained a specific reference to the parent application, it is not entitled to the earlier filing date. The '864 patent runs squarely afoul of 35 U.S.C. § 102, which in relevant part reads as follows:

"A person shall be entitled to a patent unless—

\* \* \* \* \*

"(b) the invention was \* \* \* in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States \* \* \*."

The plaintiff was building and using its first machine in late 1943, and it received an order for it at a price of $18,-500.00 on August 24, 1944. Considering that the application for the method patent was filed on August 3, 1944,[3] and made reference to prior art and to the earlier patents of Clouse and Frayer, this case is as clear an example as one could expect to find of the principle underlying § 102(b) as stated in the oft-cited case of Eastman v. Mayor, etc., of City of New York, 134 F. 844, 854 (2 Cir., 1904):

"If it be once understood that the object of the act 'was to require the inventor to see to it that he filed his application with two \* years from the completion of his invention, so as to cut off all question of the defeat of his patent by a use or sale of it by others more than two \* years prior to his application,' the courts will no longer be vexed by the perplexing questions which must frequently arise when the intent of the user and the bona fides of the use are questions to be determined on oral testimony. Isolated instances of injustice to inventors may result, but the remedy is certain and sure. *The inventor is master of the situation and has it in his power by prompt action to make the defense of prior public use impossible.* Surely two \* years after he has completed his invention is ample time in which to file his application. If he fails to take so simple and reasonable a precaution why should it not be said that the risk is his and that he cannot complain of the consequences of his own supineness?" (Emphasis added)

---

\* The two year period was changed and limited to one year effective Aug. 5, 1939. 53 Stat. 1212.

*B. Lack of Invention.*

In addition to invalidity by reason of prior public use, the '864 patent is invalid for want of invention. Turning to the '864 patent, the subject matter of which is "the novel tools and dies of this invention", a means for presenting the blanks to the work station with its punch and die set at the 3rd stage (1st step of the plaintiff's method) and trans-

---

3. Friedman, it should be noted, was no novice in the ways of the Patent Office. He was the grantee of more than thirty patents.

fer means inverting and transferring the blanks to the next work station with its punch and die set at the 4th stage (2nd step of the plaintiff's method), as found in the 11th claim of the '864 patent, designated as representative by the plaintiff, are contributions which do not rise to the level of invention. Unfortunately, the plaintiff had to admit that the turnaround transfer mechanism into which the tools and dies were to be mounted, substantially as shown in the Frayer patent, was incorporated in the first nut forming machine which the plaintiff built and sold after the method patent was invented. Frayer fully anticipated the transfer mechanism of the '864 patent, and Friedman does not disclose or claim even a minor variation over that. There is nothing in this element to support the '864 patent.

If there be any novelty in the plaintiff's punch and die tools in the header stations, such would not entitle the plaintiff to a patent on the entire combination. There was nothing new in using punches and dies in multiple station headers, nor were they used in any manner that resulted in a new or different machine. They performed no new function. They produced no new result. The fundamental rule was stated by the Supreme Court in Bassick Co. v. R. M. Hollingshead Co., 298 U.S. 415, 425, 56 S.Ct. 787, 791, 80 L.Ed. 1251 (1936):

> "The question then is whether, by this method, the patentee, *by improving one element* of an old combination whose construction and operation is otherwise unchanged, *may, in effect, repatent the old combination* by reclaiming it with the improved element substituted for the old element. That this cannot be done is shown by numerous cases in this and other federal courts." (Emphasis added.)

But, there was no novelty. It has long been recognized that the shape of cold metal blanks can be changed by use of properly directed punches and dies. In Cornell v. Chase Brass & Copper Co., supra, 142 F.2d p. 161, our Court of Appeals said:

> "*Normally it does not amount to invention to shape a die in whatever way an article capable of being so pressed out requires.* Karron v. Karron, 2 Cir., 66 F.2d 785 [1933]. *The selection of punches,* mandrels *and pressures suitable for the particular use to which they are to be put in the die ordinarily is in the same category.* There must be some extraordinary change from the old to make *variations in choice in such respects amount to more than the exercise of mechanical skill. And the same holds true in respect to the selection of blanks to use in the die.*" (Emphasis added.)

In view of the prior art in the field of cold forging nuts, a field which must encompass an enormous amount of experience in our highly mechanized and industrialized economy, whatever contributions Friedman's punches and dies might have made were nothing more than improvements likely to occur to a mechanic skilled in the art of die designing and well within the area of freedom to shape or alter them. Such improvements are not patentable. 35 U.S.C. § 103; Atlantic Works v. Brady, 107 U.S. 192, 2 S.Ct. 225, 27 L.Ed. 438 (1882); Hollister v. Benedict & Burnham Manufacturing Co., 113 U.S. 59, 5 S.Ct. 717, 28 L.Ed. 901 (1885); Thompson v. Boisselier, 114 U.S. 1, 2, 5 S.Ct. 1042, 29 L.Ed. 76 (1885); Busell Trimmer Co. v. Stevens, 137 U.S. 423, 11 S.Ct. 150, 34 L.Ed. 719 (1890).

*C. Commercial Success.*

The plaintiff stressed the wide commercial success realized in the sale of its machines, and urges that as strong evidence of invention. While striking commercial success is a relevant fact, Stiegele v. J. M. Moore Import-Export Co., 312 F.2d 588, 591 (2 Cir., 1963), and may tip the scale in favor of validity, Good Year Tire & Rubber Co. v. Ray-O-Vac Co., 321 U.S. 275, 279, 64 S.Ct. 593, 88 L.Ed. 721 (1944), it is no substitute for invention, Titcomb v. Norton Co., 307 F.2d 253, 256 (2 Cir., 1962), and cannot overcome clear proof of invalidity. H. W. Gossard Co. v. J. C. Penney Co.,

304 F.2d 515, 518 (7 Cir., 1962); Gross v. JFD Manufacturing Co., supra. In this case, the question of validity is not sufficiently close to make commercial success relevant.

Since the lack of validity of the claimed inventions is dispositive of the case, there is no need to reach the remaining issues. Judgment should enter for the defendant on its counterclaim, with costs.